273 F.2d 362
 John Foster DULLES, Edward H. Green and Eustace Seligman, as and only as Executors of Last Will and Testament of William Nelson Cromwell, deceased, Plaintiffs-Appellants,
v.
James W. JOHNSON, formerly Collector of Internal Revenue for Third District of New York, and Bruce E. Lambert, acting Collector of Internal Revenue for Third District of New York, Defendants-Appellees.
 No. 155.
 Docket 25252.
 United States Court of Appeals Second Circuit.
 Argued January 21, 1959.
 Decided December 14, 1959.
 
 Sullivan & Cromwell, New York City (Norris Darrell, S. Pearce Browning, Jr., Henry N. Ess, III, William W. Crawford, New York City, of counsel), for plaintiffs-appellants.
 Arthur H. Christy, U. S. Atty., S.D. N.Y., New York City (Renee J. Ginsberg, Arthur V. Savage, Asst. U. S. Attys., New York City, of counsel), for defendants-appellees.
 Simpson, Thacher & Bartlett, New York City (Whitney North Seymour, David G. Sacks, New York City, of counsel), for New York County Lawyers' Ass'n; Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (D. Nelson Adams, Richard R. Dailey, New York City, of counsel), for The Ass'n of the Bar of City of New York; Milbank, Tweed, Hope & Hadley, New York City (Weston Vernon, Jr., Florence Brush, New York City, of counsel), for New York State Bar Ass'n, amici curiae.
 Before WATERMAN and MOORE, Circuit Judges, and BYERS, District Judge.
 WATERMAN, Circuit Judge.
 
 
 1
 William Nelson Cromwell, a prominent New York City attorney, died in 1948. In addition to specific bequests, he provided in his will that the residue of his estate was to be divided into one hundred equal parts and distributed to various groups and organizations. Three of these parts were bequeathed to the New York County Lawyers Association, three parts to the Association of the Bar of the City of New York, and two parts to the New York State Bar Association. Two parts were bequeathed to "The William Nelson Cromwell Foundation for Research of the Law and Legal History of the Colonial Period of the United States; a Museum and Other Matters of a Legal Nature * * *." Two parts were given to the Alumni Association of the School of Law of Columbia University and three parts to Russian War Relief, Inc. During administration of the estate the Surrogate's Court held that these latter two organizations were disqualified from taking, and thereafterwards the executors, acting under discretionary power given them in the will, reallocated these five parts to the Trustees of Columbia University. This appeal involves the disposition for federal estate tax purposes of these fifteen parts of the residual estate.
 
 
 2
 A federal estate tax return was filed, in which the executors claimed deductions from the value of the decedent's gross estate for all the bequests here involved, maintaining that the purposes of the recipient organizations were "charitable, scientific, literary, or educational" within the meaning of Section 812(d) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 812(d). These deductions were disallowed by the Commissioner. The Commissioner also disallowed deduction of sums paid out of the estate to attorneys for individual legatees at the conclusion of litigation in the New York courts. Furthermore, the Commissioner's formula for computing the estate tax differed from that which plaintiffs would employ. The Commissioner assessed the resulting deficiency, the executors paid it, and thereafter filed with the Commissioner timely claims for refund.
 
 
 3
 The refund claims were disallowed and within the statutory period the executors brought suit in the Southern District of New York against the proper Collectors of Internal Revenue. The district court denied recovery of the taxes paid with respect to all these bequests save for the bequest to the William Nelson Cromwell Foundation. A deduction for the controverted administration expenses was also ordered. Dulles v. Johnson, D.C.S.D. N.Y.1957, 155 F.Supp. 275. Both parties have appealed. We shall consider first those questions raised by the appeal of the executors, and then those presented by the defendant Collectors on their cross-appeal.
 
 
 4
 * In order to secure a deduction for the bequests made to the Bar Associations plaintiffs must demonstrate that these bequests come within the language of Section 812(d) of the 1939 Internal Revenue Code which permits as a deduction from the value of the gross estate "[t]he amount of all bequests, legacies, devises, or transfers * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * * and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation * * *." The district court held that the executors failed to carry this burden, Dulles v. Johnson, 155 F.Supp. 275. That court concluded that the Associations "exist primarily to benefit members of the legal profession, and to provide a method whereby their views and recommendations as a body on legislation of various kinds is made known to the legislators." Supra, 155 F.Supp. at page 279. The court appears to have based its conclusion on the following Association activities as they existed on July 19, 1948: (1) regulation of the unauthorized practice of law; (2) institution of disciplinary measures for professional misconduct of members of the bar and judiciary; (3) recommendations with respect to judicial administration and procedure and the endorsement of candidates for judicial office; and (4) activities in support of or in opposition to various legislative proposals.
 
 
 5
 The New York County Lawyers Association (sometimes referred to as "County Lawyers") was incorporated in 1908 under the New York Membership Corporations Law, McKinney's Consol.Laws, c. 35 (Chapter 559, Laws of 1895). The Certificate of Incorporation provided:
 
 
 6
 "The purposes for which said Association is to be formed are, the cultivation of the science of jurisprudence; the promotion of reforms in the law; the facilitation of the administration of justice; the elevation of the standards of integrity, honor and courtesy in the legal profession; the cherishing of the spirit of brotherhood among the members of said Association."
 
 
 7
 County Lawyers owns its own four-story building in New York City which contains a large auditorium, a library (some 85,000 volumes as of April 1948), and a number of rooms used for conference and staff purposes. As of April 1948 there were approximately 7,000 members. The auditorium and the other facilities have been used by the Practising Law Institute for courses and lectures available to members of the bar generally. In addition, there were many other lectures and forums so available. County Lawyers publishes a magazine entitled "Bar Bulletin" which is mailed to its members and various law libraries throughout the country, and which contains articles relating to various phases of the law. Its standing and special committees comprehensively deal with a wide range of legal matters.
 
 
 8
 The Association of the Bar of the City of New York (sometimes referred to as the City Bar) was incorporated in 1871 by a Special Act of the New York Legislature (Chapter 819, Laws of 1871) (amended Chapter 134, Laws of 1924)
 
 
 9
 "* * * for the purposes of cultivating the science of jurisprudence, promoting reforms in the law, facilitating the administration of justice, elevating the standards of integrity, honor and courtesy in the legal profession, and cherishing the spirit of brotherhood among the members thereof."
 
 
 10
 The City Bar owns a four-story building in the City of New York, in which there is a large auditorium, a library of some 268,000 volumes, conference rooms, and staff and legal referral offices. The City Bar sponsors numerous lectures on a wide variety of legal subjects. The City Bar's Committee of Legal Education has sponsored a symposium on this subject at which some 45 law schools were represented. Just as in the case of the County Bar, committees are annually appointed to deal with all important phases of the law, both State and Federal. The City Bar aids in combating election frauds and actively supports legal aid work. The City Bar also publishes a magazine, entitled "The Record," which contains articles of interest both to lawyers and the public.
 
 
 11
 The New York State Bar Association (sometimes referred to as the State Bar) was incorporated in 1877 by a Special Act of the New York Legislature (Chapter 210, Laws of 1877):
 
 
 12
 "And the said association is formed to cultivate the science of jurisprudence, to promote reform in the law, to facilitate the administration of justice, to elevate the standard of integrity, honor and courtesy in the legal profession, and to cherish the spirit of brotherhood among the members thereof."
 
 
 13
 It has offices in Albany, New York. Because of the large State Law Library located in that City, the State Bar maintains only a small library. Its committees, however, cover the same wide range as the County Lawyers and City Bar committees. State Bar publishes a magazine known as "The Bulletin." In addition, it publishes pamphlets containing summaries of recent developments in the law, legislative circulars containing analyses of important bills, and a year book.
 
 
 14
 The district court conceded that much of the activity of the Associations fulfilled the requirements of Section 812(d). However, in holding that bequests to the Associations could not be deducted from the gross estate under Section 812(d) it would appear from the stipulated facts it enumerated that the court emphasized four activities in which the Associations engage. Each activity will be considered in turn.
 
 
 15
 1. Regulation of the unauthorized practice of law.
 
 
 16
 The three associations maintain committees to receive and investigate complaints dealing with unauthorized practice of law. The committees also present cases for prosecution to state or federal authorities, bring actions in behalf of the organizations, and initiate and support legislation — in order to prohibit the practice of the law by persons not admitted to the bar. We cannot say that this program does not benefit the public or that it does not serve charitable and educational purposes. Recognizing the need to protect the public, New York law makes it a misdemeanor for unauthorized persons to practice or hold themselves out as authorized to practice law. N.Y.Penal Law McKinney's Consol.Laws, c. 40, §§ 270, 271, 272; People v. Alfani, 1919, 227 N.Y. 334, 125 N.E. 671; Application of New York County Lawyers Ass'n, 1st Dept. 1948, 273 App.Div. 524, 78 N.Y.S. 2d 209, 9 A.L.R.2d 787, affirmed In re Bercu, 1949, 299 N.Y. 728, 87 N.E.2d 451. And the Bar Associations are empowered to commence proceedings for the punishment and restraint of such behavior. N.Y.Judiciary Law, McKinney's Consol.Laws, c. 30, § 750; N.Y.Civil Practice Act, § 1221-a. As stated in People v. Alfani, supra, the purpose of this regulation is "not to protect the bar * * * but to protect the public." See Hexter Title & Abstract Co. v. Grievance Committee, 1944, 142 Tex. 506, 179 S.W.2d 946, 157 A.L.R. 268; Rhode Island Bar Association v. Automobile Service Association, 1935, 55 R.I. 122, 179 A. 139, 100 A.L.R. 226. If these activities were not undertaken by the Associations, the cost of this necessary regulation would descend upon the public. Hence we conclude that as to regulation of the unauthorized practice of law the Associations must be deemed "charitable." See Duffy v. Birmingham, 8 Cir., 1951, 190 F.2d 738
 
 
 17
 2. Disciplining of the profession.
 
 
 18
 The Associations maintain committees on discipline and grievance. The work of these committees has consisted of considering complaints filed against members of the bar by laymen and attorneys, of presenting to the courts charges against some of these attorneys, and of submitting requests to the Presiding Justice of the Appellate Division to appoint attorneys designated by the Bar Associations to prosecute disciplinary proceedings. Here again we think that the district court misconceived the purpose of these activities. Lawyers play a unique and important role in our society. In its dealings with lawyers the public must often act on faith. It is the function of bar associations to see that this faith is not misplaced. New York recognizes the need for this public service and confers upon bar associations statutory powers and obligations in connection therewith. N.Y.Judiciary Law, § 90; see In re Jones, 1st Dept. 1913, 159 App.Div. 782, 145 N.Y.S. 65. While increased public esteem for lawyers may result in material advantage to members of the legal profession, the true benefit from a disciplined and socially responsive bar accrues directly to the public. Accordingly the present case is readily distinguishable from Better Business Bureau of Washington, D. C. v. United States, 1945, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67, cited by the Government, and relied upon by the court below. There it was "apparent beyond dispute that an important if not the primary pursuit of petitioner's organization [was] to promote not only an ethical but also a profitable business community." Supra, 326 U.S. at page 283, 66 S.Ct. at page 114. We agree with the case of Rhode Island Hospital Trust Co. v. United States, D.C.D.R.I.1958, 159 F.Supp. 204, 205, wherein a bequest to the Rhode Island Bar Association "to be used and employed by it for the advancement and upholding of those standards of the profession which are assumed by the members upon their admission to the Bar, and for the prosecution and punishment of those members who violate their obligations to the court and to the public," was held to be a gift to be used for charitable purposes within the meaning of Section 812(d).
 
 
 19
 3. Improving court procedure and endorsement of judicial candidates.
 
 
 20
 There is no dispute but that the associations have taken an active interest in improving legal and litigation procedure and judicial administration, and have probed into the qualifications of candidates for judicial office. In the past, for example, committees of the Associations have reported to the Judicial Council on a proposed revision of the procedure to review tax assessments on real property; they have made recommendations with respect to the Appellate Division rules, they have furthered proposals to unify and consolidate certain New York courts and proposals to increase the number of judges in New York and Federal courts. Although such complaints have been happily few, committees of the Associations have investigated complaints of misconduct by judicial officers and employees. Recommendations concerning judicial candidates have been non-partisan and reflect primarily an evaluation of the professional experience and technical ability of the candidates. Here the committees perform a most valuable function, for lawyers are peculiarly well equipped to seek out and remedy flaws in the judicial machinery and to assess the performances and capabilities of judges. In today's immensely complex society they alone, perhaps, are alert to watch for and attempt correction of manifest defects prior to the time when malfunctions become apparent to everyone. These activities clearly constitute a public service, and we fail to discern that they indicate that the Associations seek to achieve a selfish professional benefit thereby.
 
 
 21
 4. Influencing legislation.
 
 
 22
 Finally, we must consider those activities which concern or affect legislation, a subject highlighted by the district court and upon which it would appear to have placed considerable emphasis. Through their various committees the Associations study and report on proposed and existing legislation. Often they send copies of their reports and resolutions to the legislative, executive and judicial branches of the federal and state governments. The major portion of this work is of a technical nature involving the adequacy of proposed and existing legislation in terms of its form, clarity of expression and its effect on and relation to other law. The Associations' work has been expressed in expert reports on matters uniquely within the fields of experts and has avoided questions which are outside those fields, i. e., questions which turn largely on economic or political decisions.
 
 
 23
 These activities serve no selfish purpose of the legal profession — rather they constitute an expert's effort to improve the law in technical and non-controversial areas. In our opinion these activities are scientific, educational and charitable.
 
 
 24
 The Government argues that these activities constitute propaganda and represent a substantial part of all the activities of the Associations. The cases upon which the Government relies are inapposite. Those cases involved organizations whose principal purpose was to implement legislative programs embodying broad principles of social amelioration. See Marshall v. Commissioner of Internal Revenue, 2 Cir., 1945, 147 F.2d 75, certiorari denied 1945, 325 U.S. 872, 65 S.Ct. 1413, 89 L.Ed. 1991, rehearing denied 1945, 326 U.S. 804, 66 S.Ct. 14, 90 L.Ed. 490; Vanderbilt v. C. I. R., 1 Cir., 1937, 93 F.2d 360; Slee v. C. I. R., 2 Cir., 1930, 42 F.2d 184, 72 A.L.R. 400. Here, on the other hand, approval of or opposition to proposed legislation constitutes but a small portion of the total activity of the Associations. Hence this case is closer to Seasongood v. C. I. R., 6 Cir., 1955, 227 F.2d 907. Moreover, the legislative recommendations of the Associations, insofar as these recommendations do not involve matters the responsibility for which has been entrusted to the Associations by the Legislature, are designed to improve court procedure or to clarify some technical matter of substantive law. They are not intended for the economic aggrandizement of a particular group or to promote some larger principle of governmental policy. These two factors lead us to the conclusion that the recommendations of the Associations concerning impending legislation are not such as to cause the forfeiture of charitable status under Section 812(d).
 
 
 25
 Other activities of the Associations which the district court did not refer to and yet which are substantial in nature include maintaining libraries for legal research, sponsoring lectures and forums on the law, providing free legal service through participation in legal aid, and providing low cost legal service through participation in a legal referral system. All of these activities are, in our opinion, educational and charitable. United States v. Proprietors of Social Law Library, 1 Cir., 1939, 102 F.2d 481; Weyl v. Commissioner of Internal Revenue, 2 Cir., 1931, 48 F.2d 811; Estate of Audenried, 1956, 26 T.C. 120. The Associations do engage in certain other incidental activities, but these activities, some social in nature, are merely auxiliary to the charitable and educational purposes we have discussed. "Organized and operated exclusively" means only that these unconforming activities be incidental in nature. Seasongood v. C. I. R., 6 Cir., 1955, 227 F.2d 907; 1 Paul, Federal Estate and Gift Taxation 668 (1946); cf. Better Business Bureau of Washington, D. C. v. United States, 1945, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67. Such is the situation here.
 
 
 26
 Looking at the total operations of the three Bar Associations we hold that they are "charitable, scientific * * * [and] educational" within the meaning of Section 812(d) and that the district court erred in disallowing deductions for the bequests to them. The judgment is reversed with respect to the disallowance of the deductions.
 
 II
 
 27
 After the Surrogate's Court decreed that the Alumni Association of the School of Law of Columbia University and Russian War Relief, Inc. were disqualified from taking as legatees, the executors acted pursuant to that portion of the will which provided:
 
 
 28
 "Should any beneficiary named in this Article Eighth be disqualified or incompetent to receive the part or parts set opposite its name, or should not be in existence or be not functioning at the time of my decease, then and in such event, it is my specific will and absolute direction that the part or parts of such party or parties shall be distributed and disposed of by my Executors to such other party or parties named in this Article Eighth, and in such proportion, division and manner, as in their absolute judgment they may deem best."
 
 
 29
 The executors reallocated these bequests to the Trustees of Columbia University. It is conceded that Columbia qualified under Section 812(d), but the district court on the authority of Burdick v. C. I. R., 2 Cir., 1941, 117 F.2d 972, certiorari denied 314 U.S. 631, 62 S.Ct. 63, 86 L.Ed. 506, disallowed deduction on the ground that inasmuch as the executors could have reallocated to the Associations which it was holding were not charitable, scientific or educational within the meaning of that section the actual reallocation to a qualified corporation did not make the amount of the reallocated bequest deductible. Since we have reversed the district court's holding as to the Associations, Burdick is now inapplicable, and the denial of deduction for these two reallocated bequests is reversed.
 
 III
 Section 812(d) provides, in part, that
 
 30
 "If the tax imposed by section 810, or any estate, succession, legacy, or inheritance taxes, are, either by the terms of the will, by the law of the jurisdiction under which the estate is administered, or by the law of the jurisdiction imposing the particular tax, payable in whole or in part out of the bequests, legacies, or devises otherwise deductible under this paragraph, then the amount deductible under this paragraph shall be the amount of such bequests, legacies, or devises reduced by the amount of such taxes." [Emphasis supplied.]
 
 
 31
 Plaintiffs contend that the Commissioner improperly computed the amount of the "charitable" deduction allowable to the estate under this section. The parties agree that Section 812(d) requires that the estate tax first be computed without regard to the fact that part of the tax is payable out of a deductible bequest. Thereupon a sum equal to the portion of the tax which if paid would have been paid out of the charitable bequest is to be added to the taxable estate, and then the tax is recomputed. Plaintiffs argue that at this point recomputation should cease, and that the process should not continue ad infinitum. We disagree. The amount of estate tax payable under Section 810 depends on the value of the net estate. The value of the net estate is determined by subtracting allowable deductions from the gross estate including any charitable deduction allowed under Section 812(d). Under the final clause of Section 812(d) the amount of charitable deduction can only be determined after the tax on the net taxable estate has been determined. Thus the final clause of Section 812(d) requires an endless chain of computation and recomputation (compressed by the Commissioner into one algebraic formula). We find nothing in the language of the provision which would indicate, as plaintiffs seem to contend, that the provision ceases to apply after the first recomputation is made. In fact, we find that whatever authority exists is to the contrary. Cf. Harrison v. Northern Trust Co., 1943, 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407.
 
 IV
 
 32
 Defendants cross-appeal from that portion of the district court's decision permitting deduction of the bequest to "The William Nelson Cromwell Foundation for Research of the Law and Legal History of the Colonial Period of the United States of America; a Museum and other matters of a Legal Nature * * *." Here again the issue is whether the recipient qualified as a charitable organization within the meaning of Section 812(d).
 
 
 33
 We agree fully with the conclusion of the district court permitting this deduction, and on this matter we affirm the court below.
 
 V
 
 34
 On their cross-appeal defendants also contend that the district court erred in permitting deduction from the gross estate of fees paid by the estate to the lawyers who represented various legatees in estate litigation in the New York courts. The district court permitted deduction on the theory that these payments were expenses of administration under Section 812(b).
 
 
 35
 Plaintiffs initiated two proceedings in the New York County Surrogate's Court seeking to have Cromwell's will construed. In the first proceeding it was decreed, inter alia, that Russian War Relief, Inc. at the time of Cromwell's death was not a functioning organization within the intent of the will, and therefore could not receive the bequest. The Surrogate's Court directed plaintiffs to pay to the attorneys representing Russian War Relief a total of $18,290.31 as payment for counsel fees and disbursements. In the second proceeding the Surrogate decided that Article Thirteenth of the will directed payment of all estate taxes prior to the establishment of the residuary estate. This decision was appealed by some of the residuary legatees, but was affirmed by both the Appellate Division and the Court of Appeals. Each of these appellate courts directed that the costs of all parties who appealed and filed briefs should be paid out of the estate. Thereafter the Surrogate directed that plaintiffs pay out of the estate to the attorneys who represented the various residuary legatees in this litigation a total of $153,676.71 as payment for counsel fees and disbursements.
 
 
 36
 Although it seems clear that these amounts were allowed by the Surrogate's Court in accordance with the law of New York, N. Y. Surrogate's Court Act § 278, the defendant Collectors would still have us disallow this deduction. They contend that there should not be a deduction from the estate for attorneys' fees incurred by beneficiaries incident to litigation respecting their several beneficiary interests. We must disagree. These sums were paid out of the funds of the estate pursuant to a court order required as a direct and unavoidable result of the proceedings instigated by plaintiffs to construe the will they were to administer. Thus we find it impossible to reach any other result than that they were administration expenses. As such they were deductible. Other courts have reached the same result. Schmalstig v. Conner, D.C.S.D.Ohio 1942, 46 F.Supp. 531; Estate of Bluestein, 1950, 15 T.C. 770; see Commercial Nat. Bank of Charlotte v. United States, 4 Cir., 1952, 196 F.2d 182, 30 A.L.R.2d 1103. On this point, too, the district court must be affirmed.
 
 
 37
 The case is remanded for further proceedings not inconsistent with this opinion.