ESTATE of Edyth BUSH, Deceased, by Clarence J. Bassler, Jr., H. Clifford Lee, and Combank/Winter Park, as Co-Executors,

v.

The UNITED STATES.

No. 293–78.

United States Court of Claims.

March 19, 1980.

Leonard L. Silverstein, Washington, D. C., attorney of record, for plaintiff. Jerry J. McCoy, Richard J. Melnick and Silverstein & Mullens, Washington, D. C., of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty., Gen. M. Carr Ferguson, Washington, D. C., for defendant. Iris J. Brown, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and DAVIS, KASHIWA, KUNZIG, BENNETT and SMITH, Judges, en banc.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This estate tax refund case comes before us on the government's motion for summary judgment. The plaintiff challenges two aspects of a deficiency assessment against the estate of Edyth Bush. First, the plaintiff objects to the Commissioner's use, in a case where all death taxes are paid out of the charitable residuary estate, of a computational method that equalizes the charitable deduction and the actual charitable donation to determine the federal estate tax. Second, the plaintiff claims that the Commissioner incorrectly denied a deduction for state death taxes paid in excess of the maximum state death tax credit under section 2011 of the Internal Revenue Code of 1954. We hold for the government on both issues and grant its motion for summary judgment.

Edyth Bush died testate on November 20, 1972, leaving a gross estate of $134,261,384. In her will, she made specific noncharitable bequests totalling $19,062,763. The residuary estate, after payment of expenses, was bequeathed to the Edyth Bush Foundation, a charitable organization. She provided for the payment of all federal and state death taxes out of this residue.

On its federal estate tax return, the estate claimed a charitable deduction of $91,885,201, although under the estate's computations the charity actually would receive only $82,157,034. It paid $20,021,002 in federal estate taxes. The Commissioner of Internal Revenue recomputed the charitable deduction at $46,425,856, which equalled the amount the charity actually would receive. He also disallowed a deduction covering certain state death taxes the estate had paid (see part II, infra, pp. 748–749). He assessed a deficiency of $27,230,200 against the estate, which the estate paid. After the Commissioner denied its timely claim for refund, the estate brought this suit.

### I.

A. Section 2055 of the Code provides that in determining the value of a taxable estate, the amount of any charitable bequest is deducted from the value of the

gross estate.[1] The dispute in this case is over the amount of the charitable deduction. It arises because of the provision in the will that all death taxes were to be paid out of the residuary estate, here the charitable bequest. In such a situation, section 2055(c) provides that the charitable deduction is calculated by subtracting the taxes payable out of the charitable bequest from that bequest:

> If the tax imposed by section 2001, or any estate, succession, legacy, or inheritance taxes are, either by the terms of the will, by the law of the jurisdiction under which the estate is administered, or by the law of the jurisdiction imposing the particular tax, payable in whole or in part out of the bequests, legacies, or devises otherwise deductible under this section, then the amount deductible under this section shall be the amount of such bequests, legacies, or devises reduced by the amount of such taxes.

Under the statute, the estate tax and the charitable deduction are mutually dependent variables. The size of the taxable estate, and therefore the amount of the estate tax, depends upon the amount of the charitable deduction, but the charitable deduc-tion itself is calculated by reducing the charitable bequest by the amount of the taxes paid out of it.

The government interprets the statute as requiring that the charitable deduction equal the amount actually received by the charity. It provides two alternative but equivalent methods for achieving this result. One method uses a cyclical series of test computations, under which the residue available for charity is decreased on each cycle by the amount of the tax calculated on that cycle. This leads to another cycle on which the deduction is decreased, and the tax therefore increased, to reflect the residue calculated on the previous cycle. This process is repeated until the residue, or actual charitable donation, equals the deduction that produced it.[2] The second method reduces this process to a single algebraic formula. "The tax and the net charitable bequest must be determined simultaneously by algebraic formula so that the deduction for the net bequest will produce the tax which is used to compute that net bequest." 4 J. Rabkin & M. Johnson, Federal Income, Gift and Estate Taxation § 59.07(4), at 5985a (1980). *See generally* 4 J. Mertens, The Law of Federal Gift and

---

1. I.R.C. § 2055(a):

   "For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers—

   ". . .

   "(2) to or for the use of any corporation organized and operated exclusively for . . . charitable . . . purposes . . . ."

2. For example: Assume an estate after all noncharitable deductions but before the charitable deduction of $100 million, specific noncharitable bequests of $10 million, provision in the will that all estate taxes be paid out of the residuary estate, bequest of that residuary estate to a qualifying charity, and a federal tax rate applicable to the entire estate of 77 percent. In such circumstances, the first several calculations under the cycling process would be as follows:

(1)  $100,000,000 Estate (as defined above)
     − 90,000,000 Initial trial charitable deduction (total residuary estate)
     = 10,000,000 Initial trial taxable estate
       ×   77% Tax rate
     =  7,700,000 Trial gross estate tax
       82,300,000 Trial charitable donation (total residuary estate less taxes paid out of it)

(2)  $100,000,000 Estate
     − 82,300,000 Trial charitable deduction (trial charitable donation from previous calculation)
     = 17,700,000 Trial taxable estate
       ×   77% Tax rate
     = 13,629,000 Trial gross estate tax
       76,371,000 Trial charitable donation

(3)  $100,000,000 Estate
     − 76,371,000 Trial charitable deduction
     = 23,629,000 Trial taxable estate
       ×   77% Tax rate
     = 18,194,330 Trial gross estate tax
       71,805,670 Trial charitable donation

The 63rd such calculation yields a trial charitable donation of $56,521,743, which when used in the 64th calculation as a trial charitable deduction results in a trial taxable estate of $43,478,257 and a trial gross estate tax of $33,478,257. The payment of such a tax out of the residuary estate of $90,000,000 leaves $56,521,743 for the charity, which is the amount used as a charitable deduction, and thus on this calculation the requisite equality between these amounts is achieved.

Estate Taxation §§ 30.01–.23, at 641–703 (1959).[3]

In computing its estate tax, the plaintiff used a third method that adopted the first step of the government's cyclical system. But instead of repeating the cycles until the charitable deduction and the charitable contribution were equal, the plaintiff calculated the gross federal estate tax by using a charitable deduction equal to the difference between the initial residue (gross estate less noncharitable bequests and fixed deductions) and an estate tax calculated as if the entire initial residue was deductible. (In the example in footnote 2, *supra*, the plaintiff would stop after calculation (2), and take the charitable deduction and pay the tax there indicated.) This method produced a charitable deduction substantially larger than the actual amount donated to the charity—almost $10 million greater. The plaintiff argues that this method of determining the charitable deduction satisfies section 2055.

B. Although the plaintiff frames its objections to the Commissioner's calculations as directed against the computational method the Commissioner used—it states that "[t]he issue presented under section 2055(c) is solely one of methodology"—its real quarrel is not with the Commissioner's methodology but with his interpretation of the statute as requiring an equivalence between the amount of the charitable deduction and the amount the charity receives. While plaintiff has suggested various alternative computations, including several presented in its post-argument submission, they either do not produce that equivalence or involve deviations from other Code provisions applicable to this estate.

The real issue in this case, therefore, is whether the statute intends the equivalence that the Commissioner's method of computation achieves. The language of the statute, its legislative history, and the consistent course of judicial decision require an affirmative answer.

1. Section 2055(c) requires that the "amount deductible under [section 2055(a)] shall be the amount of such bequests, legacies, or devises reduced by the amount of such taxes." The intendment is clear: The amount of the charitable deduction is to be the amount of the charitable bequest reduced by the amount of the estate taxes. Here, where the charitable bequest is the residuary estate, and all death taxes are to be paid out of that residuary estate, the statute will not permit a charitable deduction other than the amount of the residuary estate less the entire amount of death taxes paid. There is no indication that the estate taxes by which the charitable bequest is to be reduced are only the taxes upon the noncharitable bequest rather than the total amount of taxes paid. The Commissioner's method of calculating the charitable deduction, but not the plaintiff's method, reduces the residuary estate by the entire amount of the taxes paid on it. *See* Treas.Reg. § 20.2055–3 (1958).

2. Deductions for charitable testamentary transfers were first permitted in the Revenue Act of 1918, ch. 18, § 403(a)(3), 40 Stat. 1057. Pursuant to this statute, the Commissioner employed an algebraic formula to calculate the tax due and the permissible charitable deduction when dealing with situations such as the one before us.

**3.** In fact, the cyclical series is infinite, and the amount of the charitable deduction will never exactly equal the amount the charity receives. Instead, it approaches a limit, at which point the charitable deduction would equal the amount going to charity. The series can be used to determine the tax because eventually the difference from cycle to cycle becomes minute and will disappear when figures are rounded to the nearest dollar. The algebraic formula represents the cyclical series and calculates the limit that the series approaches. The relationship between the formula and the limit-ap-

proaching series was noted in *Estate of Baumberger v. Commissioner*, 551 F.2d 90, 91 & n.1 (5th Cir. 1977):

"To effectuate section 2055(c), the IRS must use an algebraic formula which accounts for the fact that each time the tax is increased, the residue is decreased, thus reducing the amount of the deduction (and increasing the tax again, etc.).[1]

"1 Such calculation approaches a limit, and the use of a formula to find the limit has been approved by this circuit . . . . ."

*Edwards v. Slocum*, 264 U.S. 61, 63, 44 S.Ct. 293, 68 L.Ed. 564 (1924), rejected this formula; the Court held that "the structure of the statute is sufficient to exclude the imputation" that Congress intended to sanction the formula.

In the same year, however, Congress responded to this decision by enacting the predecessor of the present section 2055(c). Revenue Act of 1924, ch. 234, § 303(a)(3), 43 Stat. 253.[4] Congress stated (S.Rep.No.398, 68th Cong., 1st Sess. 35 (1924), *reprinted in* 1939–1 C.B. pt. 2, 266, 290) that its intent was

> to make it clear that the amount deductible under these paragraphs on account of bequests, legacies, or devises for the specified benevolent purposes shall be the net amount distributable for such purposes, after estate, legacy, or inheritance taxes imposed in respect thereof have been deducted therefrom. It is evident that if a testator leaves a residuary estate of $1,000,000 to a charity, but the estate taxes payable out of the residue reduce the amount actually distributed to the charity to $950,000, only the latter amount should be deductible, in computing the amount of the net estate, as a bequest to charity.[5]

This provision was eliminated in 1926, but was restored in the Revenue Act of 1932, *see* note 4 *supra*, as an amendment to the Revenue Act of 1926, ch. 27, § 303(a)(3), (b)(3), 44 Stat. 9. Again the accompanying Senate Report explicitly stated that the amount of the charitable deduction would be the amount going to the charity less the taxes paid out of the charitable bequest (S.Rep.No.665, 72d Cong., 1st Sess. 52 (1932), *reprinted in* 1939–1 C.B. pt. 2, 496, 537):

> The purpose of this amendment is to limit the deduction for charitable bequests, etc., to the amount which the decedent has in fact and in law devised or bequeathed to charity. . . . It is evident that where the decedent gives his residuary estate to charity, but by his will directs that such taxes shall be paid therefrom, all that he gives to charity and all that charity is entitled to receive is the residuary estate reduced by the amount of the taxes charged against it; the residuary estate being what is left after the subtraction of such taxes and other charges and prior bequests.[6]

The House Report on this section was identical. H.R.Rep.No.708, 72d Cong., 1st Sess. 49 (1932), *reprinted in* 1939–1 C.B. pt. 2, 457, 492.

The congressional intent that "the amount deductible" for charitable bequests "shall be the net amount distributable" to the charity "after estate, legacy, or inheritance taxes imposed in respect thereof have been deducted therefrom" and that "the deduction for charitable bequests" be "limit[ed]" "to the amount which the decedent has in fact . . . bequeathed to charity" would be defeated if the amount of the charitable deduction exceeded the amount the charity received.[7] The Commissioner's

---

4. This was the first of four separate enactments of this provision. It was subsequently reenacted in the Revenue Act of 1932, ch. 209, § 807, 47 Stat. 169, and was included as section 812(d) in the 1939 Code and section 2055(c) in the 1954 Code. The pertinent language has not changed since the original enactment, and any legislative or judicial comments on earlier enactments are equally applicable to section 2055(c).

5. The plaintiff argues that this very example is inconsistent with a requirement that the charitable deduction equal the amount actually going to charity. It assumes a tentative taxable estate (after all fixed deductions but before the charitable deduction) of $1,981,250, which yields a result different from that in the Senate Report if the Commissioner's formula is applied and the 1924 tax tables are used. But if a tentative taxable estate of $1,931,250 is chosen instead (and the Report does not specify the size of the estate in its example), the same formula and tax tables produce a tax of $50,000 and a charitable donation/deduction of $950,-000, as the Report specifies.

6. The Report also noted that the original enactment of this provision was "a legislative reversal of the decision in [*Edwards v. Slocum*]."

7. *See* 4 J. Mertens, *supra*, § 30.06, at 654–55 ("The amount of the charitable deduction is, in effect, measured by the amount the charity actually receives and not by the gross amount of the bequest."); 4 J. Rabkin & M. Johnson,

interpretation of the statute, but not the plaintiff's achieves this legislative objective.

3. The courts consistently have sustained the Commissioner's view that under section 2055(c) and its predecessors the amount of the charitable deduction may not exceed the amount of the charitable bequest. In *Harrison v. Northern Trust Co.*, 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943), the Supreme Court upheld an application of the Commissioner's formula, citing the above-quoted legislative history as "conclusive in favor of the Government's contention that respondents are entitled to deduct only the amount of the residuary estate actually passing to the charitable beneficiaries after provision is made for the payment of the federal estate tax." *Id.* at 480, 63 S.Ct. at 363.

Other cases reaching the same conclusion include: *Estate of Baumberger v. Commissioner*, 551 F.2d 90, 91 (5th Cir. 1977); *Estate of Aldrich v. Commissioner*, 425 F.2d 1395, 1399–1400 (5th Cir. 1970); *Estate of Luehrmann v. Commissioner*, 287 F.2d 10, 15 (8th Cir. 1961); *Dulles v. Johnson*, 273 F.2d 362 (2d Cir. 1959); *Rogan v. Taylor*, 136 F.2d 598, 599–601 (9th Cir. 1943). *Cf. First National Bank v. United States*, 340 F.Supp. 232, 236 (D.Neb.1972), *aff'd*, 490 F.2d 1054 (8th Cir. 1974) (case "distinguished from those cases where the charity takes as a residuary legatee, for there the law is settled that the amount of the charitable gift is reduced by the payment of taxes, the rationale being that, by definition, no residuary exists until all the debts, taxes, general and specific legacies have been paid").

Indeed, in *Dulles v. Johnson, supra*, the court disapproved the very method of calculating the charitable deduction the plaintiff here used. The court found "nothing in the language of the provision which would indicate, as plaintiffs seem to contend, that the provision ceases to apply after the first

recomputation is made. In fact, we find that whatever authority exists is to the contrary." 273 F.2d at 369. The court agreed with the Commissioner that "the final clause of Section 812(d) [of the 1939 Code] requires an endless chain of computation and recomputation (compressed by the Commissioner into one algebraic formula)." *Id.*

The plaintiff attempts to distinguish these cases on two grounds. First, the plaintiff notes that of the cases dealing with the Commissioner's formula, only *Edwards v. Slocum, supra*, involved a maximum tax bracket estate (which also is the situation here), and that was the one case in which the formula was rejected. The plaintiff argues that because maximum bracket estates present special problems,[8] only cases involving such estates are pertinent here. There is nothing in the statute, however, that even suggests that its meaning or application may vary depending upon the size of the estate. To the contrary, the only distinction in the Code between estates of different sizes is the tax rate.

Second, the plaintiff asserts that the "judicial approval [in these cases] was reflexive rather than analytical." It argues that *Northern Trust, supra*, did not present the issue of the permissible methodology, but instead only the question of the validity of the statute, and that subsequent judicial reliance on *Northern Trust* to support the validity of the formula was therefore misplaced. The Court in *Northern Trust*, however, did not merely uphold the statute; it also approved the Commissioner's interpretation of it. The Court stated that taxpayers "are entitled to deduct only the amount . . . actually passing to the charitable beneficiaries" (317 U.S. at 480, 63 S.Ct. at 363) and, as we have shown, only the Commissioner's methodology achieves that result. The lower courts, building upon *Northern Trust*, properly approved the Commissioner's formula.

*supra*, § 59.07(4) at 5985 ("The purpose of this provision is to limit the estate's deduction to an amount no greater than that which the exempt organization actually receives.").

8. The plaintiff points to the facts that the effect of section 2055(c) is greatest on a maximum bracket estate and that the maximum bracket rate was much smaller when the provision was originally enacted.

C. The plaintiff's arguments that the Commissioner's methods are arbitrary and unreasonable and that his "pyramidal computation method was without authority" do not withstand analysis.

1. The plaintiff refers to "the exceptional complexity of the calculations involved in the instant matter," states that "[o]ne's credulity strains at the idea that the draftsmen could consider describing [the use of such calculations] in such an indirect manner," and concludes that without explicit statutory authorization the calculations are impermissible.

The calculations involved here, however, are not so complex that their use is unreasonable.[9] The plaintiff's own submissions so demonstrate. The method of calculation used in the Commissioner's cyclical recomputations is identical to that used in the plaintiff's one-cycle method. Performing that operation 60 or 70 times instead of once may be more time-consuming, but it is not more complex. Furthermore, the plaintiff's Submission Supplementing Oral Argument, prepared in the 15 days following argument in this case, contains an example of a repetitive recomputation involving 64 cycles. It also includes several examples of computations using the algebraic formula.

The plaintiff further suggests that the complexity of the computational methods leads to a "high possibility of computational error," and raises the possibility that the computations applied to the plaintiff may have been erroneous. There is no showing, however, that such error occurred here, and we can presume that if computational error had occurred, the plaintiff, with its impressive battery of expert assistance, would have discovered it.[10] In any event, such an error would not justify invalidating the Commissioner's computational method; it would warrant only an adjustment in the amount of the tax.

2. The plaintiff also argues that the Commissioner's methods impose "an effective tax rate upon non-charitable transferees which—because of the pyramiding consequence of the Government's position—far exceeds 100 percent." (The gross federal estate tax assessed by the Commissioner is approximately 315 percent of the amount of the noncharitable bequests.) According to the plaintiff, this result violates the congressional judgment not to tax estates at rates higher than 77 percent, "is unreasonable and arbitrary, could not have been

---

9. Of course, the computations in these situations may at times be quite involved, but the Internal Revenue Service provides detailed instructions and examples to assist taxpayers in setting up and carrying out the computations. *See* Supplemental Instructions for Form 706-Tax Tables and Instructions for Computing Interrelated Marital and Charitable Deductions, *reprinted in* 3 Fed.Est. & Gift Tax Rep. (CCH), at 21,053. Furthermore, if requested, the Service will perform these calculations for taxpayers. *See* 1 Fed.Taxes Est. & Gift (P–H) ¶ 120,-559.

10. The plaintiff does assert that the Commissioner made a computational error by using 77 percent, not 79.4 percent, in the formula as the maximum bracket tax rate applied to the estate. (The 79.4 percent figure is derived from *the purported fact that the estate is paying* 18.4 percent of the net taxable estate in total state death taxes—115 percent of the 16 percent federal credit—in addition to the net federal tax rate of 61 percent. *See* note 11 *infra.* The plaintiff relies on analyses prepared at its request by Price Waterhouse & Co., a public accounting firm, which concluded that the Commissioner's making of that error and the

government's continued inability to recognize it even after it has been called to its attention indicates that this method of computing the tax is "so arcane and difficult" that it is of questionable validity.

Even if the Commissioner has so erred, however, using the wrong tax rate would not be a "computational error," but instead would be a *mistake in establishing the formula itself.* Furthermore, the plaintiff's analysis relies on a mistaken interpretation of the agreement between the plaintiff, Minnesota, and Florida, pursuant to which the state death taxes were paid (*see* the discussion of the agreement pp. 748–749, *infra*). The plaintiff views that agreement as requiring the calculation of the state taxes on the basis of the actual federal tax and maximum credit, while the agreement *in fact provides that the total state death tax* rate of 115 percent is applied to a hypothetical figure, *i. e.*, the "maximum state death tax credit . . . computed as though Florida had been the only state or territory imposing a death tax on the decedent's taxable estate." The Commissioner's calculations correctly used a state tax figure computed on this basis.

intended by Congress, and ought not to be permitted to stand in the absence of specific statutory authority."

This argument involves a misconception of the nature of the federal estate tax. The estate tax is "imposed on the transfer of the taxable estate," section 2001(a), whose value is "determined by deducting from the value of the gross estate the exemption and deductions provided for in this part," section 2051. As the plaintiff itself notes, the tax is not imposed on the receipt of property by the decedent's beneficiaries. In maximum bracket estates, the gross federal estate tax frequently will be several hundred percent of the amount actually received through nondeductible bequests, since by definition the tax is paid out of the taxable estate, and the amount of the tax is therefore included in the amount of the taxable estate. Under federal tax law this fact is irrelevant.

■ The Commissioner's methods conform to the definitions in sections 2001 and 2051; the plaintiff's claim that the amount of tax due is to be determined by comparing it to the amount of the noncharitable bequests does not. Indeed, the plaintiff's own computations undercut its argument. On its return the plaintiff deducted the amount it claimed as a charitable deduction from the gross estate and applied the tax rate to the resulting amount, which was significantly larger than the noncharitable bequests. The gross estate tax of more than $25 million the plaintiff reported itself is more than 125 percent of the amount of the noncharitable bequests of $19 million. Thus, the plaintiff did the very thing it criticizes in the government's computations, only to a lesser extent.

## II.

Following Mrs. Bush's death, problems arose with respect to the state death taxes owed by the estate. Mrs. Bush had lived for many years in Minnesota, and main-

tained through a corporation a house there until her death. Six years before her death, however, she moved to Florida. Both Minnesota and Florida asserted death tax claims against the estate, and to settle these claims, the co-executors of the estate and the taxing authorities of the two states entered into negotiations. An agreement resulted that Minnesota would receive 50 percent and Florida 65 percent of

[t]he maximum state death tax credit under federal estate tax law computed as though Florida had been the only state or territory imposing a death tax on the decedent's taxable estate, and no part of that death tax had been taken as a deduction under the provisions of Section 2053(d) of the Internal Revenue Code, as amended.

The estate paid, therefore, state taxes totalling 115 percent of the maximum federal credit. On the federal return, it claimed the maximum credit and, in addition, deducted pursuant to section 2053(d) the extra 15 percent as a payment of a state death tax on a transfer to a charitable organization. The second issue in this case is the correctness of the Commissioner's disallowance of the 15 percent by which the state death taxes paid to Florida and Minnesota exceeded the maximum federal credit provided by section 2011.

Section 2011(a) provides a credit against the gross federal estate tax equal to "the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or Territory or the District of Columbia, in respect of any property included in the gross estate (not including any such taxes paid with respect to the estate of a person other than the decedent)." The credit, however, is limited in the maximum bracket to 16 percent of the adjusted taxable estate.[11] Section 2011(b). Generally, death taxes of any type are not deductible from the gross estate, even if they exceed the maximum credit. Section 2053(c)(1)(B).

---

11. This has the effect of reducing the net maximum bracket federal estate tax to 61 percent rather than 77 percent when the state death tax is at least as great as the maximum credit.

Both Minnesota and Florida assess estate taxes equal to the maximum credit. *See* note 13 *infra*.

There is an exception in section 2053(d), which provides in pertinent part that

(1) . . . the value of the taxable estate may be determined, if the executor so elects [within the limitations period], by deducting from the value of the gross estate the amount (as determined in accordance with regulations prescribed by the Secretary or delegate) of—

(A) any estate, succession, legacy, or inheritance tax imposed by a State [or Territory] or the District of Columbia upon a transfer by the decedent for public, charitable, or religious uses described in section 2055 . . . .

Thus, an estate may deduct the amount of any state death taxes paid on a transfer to a charitable beneficiary.[12]

■ Under its agreement with Florida and Minnesota, the plaintiff here paid state death taxes to those states totalling 115 percent of the maximum section 2011 credit. It elected to take the entire available credit and attempted to deduct the remainder (15 percent of the maximum credit and 2.4 percent of the taxable estate), claiming that because the incidence of this additional tax fell wholly on the charitable beneficiary, section 2053(d) covers it.

Neither Minnesota nor Florida imposes a death tax of any type on charitable bequests, however,[13] and we conclude, therefore, that none of the death taxes paid to these two states were "imposed . . . upon a transfer by the decedent for . . charitable . . . uses," as the statute

requires. It is irrelevant that the incidence of these taxes falls on the charity. Under the will, the incidence of all the death taxes the estate paid falls on the charity. But that does not mean, for example, that the federal estate tax, which is calculated pursuant to a statute giving a deduction for charitable bequests, is a tax imposed on a charitable transfer.

The plaintiff urges that even though neither state's statute imposes a tax upon charitable bequests, the "state death taxes owed to each jurisdiction were based upon negotiations between the parties . . . [and] were assessed and paid expressly *in lieu* of an assessment based upon each state's statutory rules . . . . Accordingly, any statutory tax exemptions accorded to transfers to charity are not relevant . . . ." (Emphasis in original.) What is irrelevant, however, is the negotiated nature of the state death taxes the estate paid. Even when the amount of the tax is determined through negotiation, the tax actually paid must be authorized by the state's tax laws. Charitable testamentary transfers are not subject to taxation in either state. In fact, in this case, each state settled for *less* than it would have received if it had been the only state collecting a death tax, even though neither state would then have been taxing a charitable transfer.

### III.

The plaintiff contends that summary judgment for the government is inappropri-

12. The election to take a credit precludes, however, taking a deduction for the taxes for which the credit is taken, even if the entire state tax was assessed against a charitable transfer. Section 2053(d)(3)(A).

13. Florida imposes an estate tax on the transfer of property by a decedent resident there at the time of death. The tax is defined as equal to the maximum federal credit less any constitutionally valid death taxes actually paid to other states. Fla.Stat.Ann. § 198.02 (West Supp. 1979). By thus basing its tax on the federal tax, Florida excludes any tax on charitable transfers. (The definitions of gross and net estate in Florida's estate tax law are similarly based on the federal definitions and also embody the federal deduction for charitable transfers. *Id.* § 198.01(8) & (9) (West 1971).)

Minnesota imposes an estate tax equivalent to Florida's, *i. e.*, on transfers by resident decedents and equal to the maximum federal credit. Minn.Stat.Ann. § 291.34 (West 1972). It also imposes an inheritance tax on, *inter alia*, testamentary dispositions of property by residents. *Id.* § 291.01. Charitable transfers are specifically exempted from the inheritance tax. *Id.* § 291.05(1). Thus, if the decedent had been a Minnesota resident at the time of her death and Minnesota had been able to assess its full death taxes against her estate and her testamentary transfers, the plaintiff would have paid in excess of the maximum federal credit an amount equal to the state inheritance tax, and would not have been entitled to a section 2053(d) deduction.

ate because there are substantial factual disputes. These disputes pertain to the plaintiff's allegation that "procedural irregularities may have occurred in the processing of this case." The plaintiff charges, first, that the "Commissioner has not maintained a uniform administrative policy" in section 2055(c) cases and used a different method of calculation of the charitable deduction in this case than he used in other, comparable cases, and second, that "interested third parties . . . may have contacted Internal Revenue Service personnel conducting the estate tax audit." [14]

In support of these allegations, the plaintiff has submitted affidavits by one of the attorneys involved in the probate of the estate. The plaintiff also seeks further information from the government through a motion for the production of documents.

█ On the basis of the record before us, we cannot conclude that there are factual disputes that warrant a trial or that the plaintiff is entitled to the production of documents that it seeks.

A. With respect to the charge of discriminatory treatment, the plaintiff initially submitted only an affidavit stating that three unidentified estates were treated differently from the plaintiff. The plaintiff subsequently provided a further affidavit elaborating on this charge. The affiant asserts that the estate of Archibald G. Bush, which also paid the estate taxes out of a charitable residuary, was treated differently than the Commissioner treated the plaintiff. The plaintiff still has not provided even the names of any other estates allegedly treated more favorably than itself.

The government responds that the Archibald Bush case was resolved through settlement, and that the original statutory notice of deficiency in that case was based upon the same application of section 2055(c) that the Commissioner used here. There is no basis for concluding that there was inconsistent administrative practice, where in the only case allegedly treated differently the Commissioner initially applied the statute the same way, and the alleged difference in treatment resulted from a settlement.

B. With respect to the charge of unwarranted interference in the administrative process by outside parties, the plaintiff has filed an affidavit alleging that such interference took place in conferences between the Internal Revenue Service and attorneys representing the state taxing authorities of Minnesota and Florida. Such discussions, however, probably are a necessary part of the audit of an estate such as this. Consultation and discussion with state authorities would be especially important in a case where there is a dispute over which states will tax the estate and to what extent, as occurred here. Without any specific showing or even allegation that this practice involved any improprieties,[15] these speculative generalities do not justify a trial.

C. Apparently recognizing the lack of anything substantial in the record to show or suggest administrative wrongdoing, the plaintiff seeks additional information from the government to develop these claims. But without any reason to believe that such wrongdoing has taken place, the plaintiff is not entitled to conduct a fishing expedition to see whether it can turn anything up.[16]

14. The plaintiff also suggests that a trial is appropriate to determine "[t]he intentions of the parties respecting [the state death tax] agreements and their effect upon this estate's tax liability." Our holding in section II, *supra*, that the state death death taxes the estate paid were not taxes paid upon a charitable bequest obviates any need to determine the parties' intentions.

15. The plaintiff claims only that the *ex parte* communications took place and merely suggests an appearance of wrongdoing because of

the asserted economic interest of the communicating parties.

16. The plaintiff's request seeks virtually all information regarding all estates analogous to the plaintiff during the period from 1955 to 1972, all materials prepared by the Treasury Department or the Service concerning the official policy regarding the issues involved in this case, all documents pertaining to any communication between the Service and any third parties, and any materials used in the computation of the estate tax assessed against the plaintiff.

## CONCLUSION

The government's motion for summary judgment is granted, the plaintiff's motion for the production of documents is denied, and the petition is dismissed.