**CHRISTIAN ECHOES NATIONAL MINISTRY, INC., Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 72–1308.

United States Court of Appeals, Tenth Circuit.

Dec. 18, 1972.

Rehearing Denied Jan. 17, 1973.

taxpayer qualified for tax exemption under 26 U.S.C.A. Section 501(c)(3). The Government appealed to the United States Supreme Court which vacated the judgment and remanded for entry of a new decree. United States v. Christian Echoes National Ministry, Inc., 404 U.S. 561, 92 S.Ct. 663, 30 L.Ed.2d 716 (1972). The District Court entered the same decision on February 24, 1972. The Government takes this appeal therefrom.

Christian Echoes is a nonprofit religious corporation organized in 1951 under the laws of Oklahoma by Dr. Billy James Hargis, its president, chief spokesman and an ordained minister. The Articles of Incorporation state in part that the corporation is founded "to establish and maintain weekly religious, radio and television broadcasts, to establish and maintain a national religious magazine and other religious publications, to establish and maintain religious educational institutions, . . . " Article III of the Articles of Faith in the corporate by-laws reads as follows:

"We believe in God, Supreme and Eternal, and in Jesus Christ as His Son, perfect Deity, and in the Holy Comforter and Challenger of this age, The Holy Ghost, and in the Bible as the inspired Word of God.

We believe that the solution of the World's problems, economic, political and spiritual, is found by the application of Christian Teachings in the lives of men and nations rather than in political ideologies of any kind.

We believe in the Twentieth Century Reformation to combat apostate conditions with the Church.

We realize atheistic world forces seek the destruction and overthrow of all the religions of the World, including particularly that founded upon the teachings of Jesus Christ. The same forces seek also the destruction of all free governments, in which the lives and property of the people are protected by civil, moral and spiritual law.

LeRoy Blackstock, Tulsa, Okl. (Craig Blackstock and J. C. Joyce, Tulsa, Okl., on the brief), for appellee.

Stephen Schwarz, Tax Division, Department of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Tulsa, Okl., Meyer Rothwacks and Grant W. Wiprud, Tax Division, Department of Justice, Washington, D. C., Nathan G. Graham, U. S. Atty., Robert P. Santee, Asst. U. S. Atty., Washington, D. C., of counsel, on the brief), for appellant.

Before PHILLIPS, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Christian Echoes sued for refund of Federal Insurance Contribution Act (FICA) taxes for 1961 and 1963 through 1968 amounting to $103,493.08 plus statutory interest. On June 24, 1971 the District Court held that the

We associate ourselves together to educate and proclaim the essential truths of Christianity, and the doctrine: Jesus Christ is the Hope of the World and America is God's Greatest Nation under the Living Son.

We believe in the real spiritual unity in Christ of all redeemed by His precious blood.

We believe in constitutional government, whereby religious as well as other freedoms of mankind are preserved and protected. ·

We believe in the fundamentals of New Testament Christianity, and we propose to promulgate the eternal truths thereof at all costs."

The activities of the organization have been addressed to that theology ever since the date of incorporation.

Christian Echoes maintains religious radio and television broadcasts, authors publications, and engages in evangelistic campaigns and meetings for the promotion of the social and spiritual welfare of the community, state and nation. Dr. Hargis has stated that its mission is a battle against Communism, socialism and political liberalism, all of which are considered arch enemies of the Christian faith. Dr. Hargis testified that Christian Echoes supports "Christian conservative statesmen . . ." without regard to party political labels. The organization publishes a monthly anti-Communist magazine, *Christian Crusade*, a weekly "intelligence report", *Weekly Crusader*, and a newspaper column, "For and Against". It also distributes pamphlets, leaflets and broadcast reprints on aspects of anti-Communist activity; it distributes tapes and records of selected broad casts; and it conducts an annual anti-Communist leadership school whose goal is to answer the question, "What can my community do to stem the forces of liberalism and thus stop the growth of socialism and communism?" In 1962 it established a Summer Anti-Communist University and formed youth groups, Torchbearer Chapters, to educate the public on the threat of Communism. In 1964 Christian Echoes encouraged adults to organize local Christian Crusade chapters. Christian Echoes appealed for contributions from the public to carry on its campaign. It earned money from the sale of its publications, tapes, films and admission fees at rallies. From 1961 through 1966 its gross receipts ranged from about $677,000 to $1,000,000 per year. It spent 52% of this income on radio, television, publications and postage.

On March 12, 1953 the Internal Revenue Service ruled that Christian Echoes qualified as a tax-exempt religious and educational organization under Section 501(c)(3) of the 1954 Code, formerly Section 101(6) of the 1939 Code. Section 501(c)(3) states as follows:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, *no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.*" (Emphasis curs.)

In 1962 and 1963 the National Office of the Internal Revenue Service requested that the activities and financial affairs of Christian Echoes be re-examined. The IRS agents recommended no change in its exempt status. The National Office, after reviewing and analyzing the activities of Christian Echoes, recommended that the exemption be revoked. On November 13, 1964 the District Director in Oklahoma City advised Christian Echoes in a letter of the revocation of its exemption and of its protest rights. Christian Echoes filed a formal protest on June 25, 1965 after

conferences with the District Director and the National Office. The District Director notified Christian Echoes on September 22, 1966 that its exempt status was being revoked for three reasons: (1) it was not operated exclusively for charitable, educational or religious purposes; (2) it had engaged in substantial activity aimed at influencing legislation; and (3) it had directly and indirectly intervened in political campaigns on behalf of candidates for public office. Christian Echoes filed further protests without avail. It paid the taxes as assessed. Christian Echoes then filed this refund suit, claiming its right to exemption.

The District Court held that the taxpayer was entitled to tax-exempt status under Section 501(c)(3). The Court ruled that Christian Echoes qualified in that no substantial part of its activities had been devoted to attempts to influence legislation or intervene in political campaigns. The Court found that the only activity of Christian Echoes relating to an attempt to influence legislation was in support of the Becker Amendment urging support of restoration of prayers in the public schools. The Trial Court accepted Dr. Hargis's interpretation of the "attempts to influence legislation" prohibition in 501(c)(3), wherein Dr. Hargis testified on cross-examination that:

> ". . . it's my interpretation that as long as I don't lobby in Washington, which I never have, as long as I don't get behind a bill or a—post a bill which I never have, as long as I don't endorse a political candidate, which I never have . . . that by no stretch of the imagination could you say what I am doing is political, . . ."

It also held that all of its activities were motivated by sincere religious convictions; that the First Amendment prohibits the Government and courts from determining whether the activities are religious or political; and that the IRS had revoked Christian Echoes' exempt status without evidence to support its

action and without constitutionally justifiable cause in violation of the First Amendment. It found that the taxpayer had been denied its right to due process under the Fifth Amendment because the Government had arbitrarily selected it from organizations engaged in similar activities and had violated its published administrative procedures in the steps leading to the revocation.

The Government appealed directly to the United States Supreme Court which dismissed the appeal for lack of jurisdiction, vacated the District Court's judgment and remanded for entry of a new decree. The IRS appeals from the District Court's holding in favor of Christian Echoes following remand.

The Government contends that: (1) the taxpayer failed to qualify as tax-exempt under Section 501(c)(3); (2) its interpretation and application of Section 501(c)(3) did not violate the taxpayer's rights under the First Amendment; (3) its revocation of tax-exempt status to the taxpayer under Section 501(c)(3) did not violate the taxpayer's rights of due process under the Fifth Amendment; and (4) the Commissioner did not abuse his discretion in revoking the exemption with retroactive effect.

## I.

The Government contends that Christian Echoes failed to qualify as tax-exempt under Section 501(c)(3) because: (1) a *substantial* part of its activities consisted of carrying on propaganda, or otherwise attempting to influence legislation; and (2) it participated or intervened in political campaigns on behalf of candidates for public office. The issue raises the interpretation and application of Section 501(c)(3).

 Almost since the earliest days of the federal income tax, Congress has exempted certain corporations from taxation. The exemption to corporations organized and operated exclusively for charitable, religious, educational or other purposes carried on for charity is

granted because of the benefit the public obtains from their activities and is based on the theory that:

" . . . the Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare." H.R.Rep.No.1860, 75th Cong., 3d Sess. 19 (1939).

Tax exemptions are matters of legislative grace and taxpayers have the burden of establishing their entitlement to exemptions. Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953). The limitations in Section 501(c)(3) stem from the Congressional policy that the United States Treasury should be neutral in *political affairs and that substantial activities directed to attempts to influence legislation or affect a political campaign should not be subsidized.*

The limitation in Section 501(c)(3) originated in the Revenue Act of 1934, allowing tax exempt status to organizations, if "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." The case which led to the 1934 legislation was Slee v. Commissioner of Internal Revenue, 42 F.2d 184 (2nd Cir. 1930). There the Court held that the American Birth Control League was not entitled to a charitable exemption because it disseminated propaganda to legislators and the public aimed at the repeal of laws preventing birth control. The IRS denied tax exempt status because the Birth Control League's purposes were not exclusively charitable, educational or scientific. In 1954 Congress attached a further condition to exempt status by adding the bar against participation or intervention in political campaigns on behalf of candidates for public office.

■ A religious organization that engages in substantial activity aimed at influencing legislation is disqualified from tax exemption, whatever the motivation. The Government has at all times recognized Christian Echoes as a religious organization. Indeed, the Government acknowledges that in all of its activities, Christian Echoes has been religiously motivated.

The critical issue is whether the limitation on attempts to influence legislation should be given the narrow interpretation applied by the District Court or a broader construction. The District Court held that the only attempt to influence legislation by Christian Echoes was in its support of the Becker Amendment relating to restoration of prayers in the public schools. By this construction, there must be specific legislation before Congress in order for the "attempt to influence legislation" prohibition to come into play. We disagree. We hold that the Trial Court was clearly erroneous in this interpretation of law.

■ Treasury Regulation 1.501(c)(3)–1(c)(3)(ii) states that an organization will be regarded as attempting to influence legislation if the organization:

"(a) Contacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation; or

(b) Advocates the adoption or rejection of legislation."

Legislation is defined in the regulations as:

" . . . action by the Congress, by any State legislature, by any local council or similar governing body, or by the public in a referendum, initiative, constitutional amendment, or similar procedure." Treas.Reg. 1.501(c)(3)–1(c)(3)(ii)(b).

The Regulation goes well beyond the District Court's interpretation of Section 501(c)(3). It includes direct and indirect appeals to legislators and the public in general. Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). We hold that the

Regulation properly interprets the intent of Congress. A capsule review of the "substantial" activities of Christian Echoes will adequately demonstrate, we believe, that Congress intended that the limitations be given a broad or liberal interpretation.

Christian Echoes' publications, such as the *Christian Crusade,* contained numerous articles attempting to influence legislation by appeals to the public to react to certain issues. These articles were either authored by Dr. Hargis, members of his organization, solicited contributors, or unsolicited authors—but all such articles had the stamp of approval of Dr. Hargis before acceptance for publication. The fact that specific legislation was not mentioned does not mean that these attempts to influence public opinion were not attempts to influence legislation. For example, Christian Echoes appealed to its readers to: (1) write their Congressmen in order to influence the political decisions in Washington; (2) work in politics at the precinct level; (3) support the Becker Amendment by writing their Congressmen; (4) maintain the McCarran-Walter Immigration law; (5) contact their Congressmen in opposition to the increasing interference with freedom of speech in the United States; (6) purge the American press of its responsibility for grossly misleading its readers on vital issues; (7) inform their Congressmen that the House Committee on Un-American Activities must be retained; (8) oppose an Air Force Contract to disarm the United States; (9) dispel the mutual mistrust between North and South America; (10) demand a congressional investigation of the biased reporting of major television networks; (11) support the Dirksen Amendment; (12) demand that Congress limit foreign aid spending; (13) discourage support for the World Court; (14) support the Connally Reservation; (15) cut off diplomatic relations with communist countries; (16) reduce the federal payroll by discharging needless jobholders, stop waste of public funds and balance the budget; (17) stop federal aid to education, socialized medicine and public housing; (18) abolish the federal income tax; (19) end American diplomatic recognition of Russia; (20) withdraw from the United Nations; (21) outlaw the Communist Party in the United States; and (22) to restore our immigration laws.

The taxpayer also attempted to mold public opinion in civil rights legislation, medicare, the Postage Revision Act of 1967, the Honest Election Law of 1967, the Nuclear Test Ban Treaty, the Panama Canal Treaty, firearms control legislation, and the Outer Space Treaty. These appeals urging the readers to action all appeared in Christian Echoes' publications between 1961 and 1968. They were all attempts to influence legislation through an indirect campaign to mold public opinion. This was directly evidenced by Dr. Hargis' keynote address delivered at the Anti-Communist Leadership School on February 11, 1963, entitled "Counter Strategy for Counter Attack". After setting forth a 10-point program, he stated that "Your opinion isn't worth a nickel without your action to back it up."

■ The political activities of an organization must be balanced in the context of the objectives and circumstances of the organization to determine whether a *substantial* part of its activities was to influence or attempt to influence legislation. Krohn v. United States, 246 F.Supp. 341 (D.Colo.1965). A percentage test to determine whether the activities were substantial obscures the complexity of balancing the organization's activities in relation to its objectives and circumstances. Cf. Seasongood v. Commissioner of Internal Revenue, 227 F.2d 907 (6th Cir. 1955). An essential part of the program of Christian Echoes was to promote desirable governmental policies consistent with its objectives through legislation. Kuper v. Commissioner of Internal Revenue, 332 F.2d 562 (3rd Cir. 1964), cert. denied 379 U.S.

920, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964). The activities of Christian Echoes in influencing or attempting to influence legislation were not incidental, but were substantial and continuous. The hundreds of exhibits demonstrate this. These are the activities which Congress intended should not be carried on by exempt organizations.

■ In addition to influencing legislation, Christian Echoes intervened in political campaigns. Generally it did not formally endorse specific candidates for office but used its publications and broadcasts to attack candidates and incumbents who were considered too liberal. It attacked President Kennedy in 1961 and urged its followers to elect conservatives like Senator Strom Thurmond and Congressmen Bruce Alger and Page Belcher. It urged followers to defeat Senator Fulbright and attacked President Johnson and Senator Hubert Humphrey. The annual convention endorsed Senator Barry Goldwater. These attempts to elect or defeat certain political leaders reflected Christian Echoes' objective to change the composition of the federal government.

## II.

■ The Government contends that its application of Section 501(c)(3) does not violate the free exercise clause in the First Amendment. Christian Echoes argues strenuously that denial of its tax-exempt status is a direct infringement upon its First Amendment right of free exercise of religion, and discrimination against the religion of its followers. The District Court agreed. The District Court held that the First Amendment forbids the Government and courts from deciding whether such activities are religious or political, and if political, whether substantial. The District Court held that the Government revoked the taxpayer's exempt status without a constitutionally justifiable cause, denying the taxpayer the free exercise

of religion. We disagree. We hold that the Court erred.

If we were to adopt the District Court's findings and the arguments advanced by Christian Echoes, we would be compelled to hold that Congress is constitutionally restrained from withholding the privilege of tax exemption whenever it enacts legislation relating to a nonprofit religious organization. This is fully evidenced by the trial court's Conclusion of Law No. 4 which is both clearly erroneous and irrelevant to the substantive issue relating to *substantial* activity for the purpose of attempting to influence legislation. There the Court concluded in part:

"The Court having found as fact that plaintiff through its followers believes in the religious nature of its activities, neither defendant nor this Court may inquire into such activities and work product of plaintiff for the purpose of determining whether those activities claimed by plaintiff to be religious are religious or political and, if political, whether substantial, for the purpose of denying tax exempt status to plaintiff. To make such an inquiry would first require this Court to define the terms 'religious' and 'political,' then separate plaintiff's activities into these two categories applying those labels thereto under definitions established by this Court. This action would require both a quantitative and qualitative analysis of plaintiff's activities. To do so would require an interpretation of the meaning of the church doctrine espoused by plaintiff and a determination of the relative significance of the religion of plaintiff to its activities."

We know of no legal authority supporting the conclusion set forth above. Such conclusion is tantamount to the proposition that the First Amendment right of free exercise of religion, ipso facto, assures no restraints, no limitations and, in effect, protects those exercising the right to do so unfettered. We hold that

the limitations imposed by Congress in Section 501(c)(3) are constitutionally valid. The free exercise clause of the First Amendment is restrained only to the extent of denying tax exempt status and then only in keeping with an overwhelming and compelling Governmental interest: That of guarantying that the wall separating church and state remain high and firm. We reject both the District Court's findings and conclusions on the First Amendment constitutional issue just as the United States Supreme Court put down attacks against the enforcement of the provisions of the "Hatch Act" predicated on First Amendment free speech and assembly rights, restraining political activities by certain federal officers and employees in United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) and Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947). In these decisions the courts held that the First Amendment rights are not absolutes and that courts must balance First Amendment freedoms against the congressional enactment in order to protect society against political partisanship by Government employees.

▆ In light of the fact that tax exemption is a privilege, a matter of grace rather than right, we hold that the limitations contained in Section 501(c)(3) withholding exemption from nonprofit corporations do not deprive Christian Echoes of its constitutionally guaranteed right of free speech. The taxpayer may engage in all such activities without restraint, subject, however, to withholding of the exemption or, in the alternative, the taxpayer may refrain from such activities and obtain the privilege of exemption. The parallel to the "Hatch Act" prohibitions relating to political activities on the part of certain federal and state employees is clear: The taxpayer may opt to enter an area of federal employment subject to the restraints and limitations upon his First Amendment rights. Conversely, he may opt

not to receive employment funds at the public trough in the areas covered by the restraints and thus exercise his First Amendment rights unfettered. The Congressional purposes evidenced by the 1934 and 1954 amendments are clearly constitutionally justified in keeping with the separation and neutrality principles particularly applicable in this case and, more succinctly, the principle that government shall not subsidize, directly or indirectly, those organizations whose substantial activities are directed toward the accomplishment of legislative goals or the election or defeat of particular candidates. From a review of the entire record we hold that the trial court's findings of fact and conclusions of law in this area are clearly erroneous. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

### III.

▆ The Government also contends that its application of Section 501(c)(3) did not arbitrarily discriminate against Christian Echoes in violation of the Fifth Amendment due process clause as found by the District Court. The Court found that the Government had arbitrarily selected Christian Echoes in violation of the due process clause. The Fifth Amendment provides that no person shall be deprived of life, liberty or property without due process of law. An organization is being discriminated against in violation of the due process clause only when there is no reasonable relationship to a proper governmental objective. In order to establish discrimination violating the due process clause, the taxpayer must show discrimination based on differences of religion, race, politics or an unacceptable classification. No discrimination is apparent in the record. The fact that the Commissioner has not proceeded against other organizations similar to Christian Echoes does not amount

to a denial of due process. Oyler v. Boles, Warden, 368 U.S. 448, 82 S.Ct. 501, 7 L. Ed.2d 446 (1962).

The District Court also erred in its holding that the IRS's departure from its administrative procedures constituted a denial of due process. The taxpayer has not shown any prejudice by deviations from normal procedures.

### IV.

The Government alleges that the Commissioner did not abuse his discretion in applying the revocation retroactively. Christian Echoes was notified in November of 1964 that its exempt status might be revoked. The status was formally revoked in September of 1966. The revocation was based on a review of activities during the years 1961–1963. Tax liabilities were assessed for all periods from 1961 through 1966. Section 7805(b) of the Code of 1954 gives the Commissioner the power to prescribe taxes retroactively and his discretion will not be disturbed unless it constitutes an abuse of discretion. Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S. Ct. 707, 1 L.Ed.2d 746 (1957). The tax may be applied retroactively where there has been a misrepresentation or omission of material facts upon which the issuance of the ruling is based. Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue, 324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969, 84 S.Ct. 1135, 12 L.Ed.2d 84 (1964); Birmingham Business College, Inc. v. Commissioner of Internal Revenue, 276 F.2d 476 (5th Cir. 1960). The facts developed on audit were materially different from the facts disclosed in the taxpayer's original exemption application. It did not refer specifically to Christian Echoes' substantial involvement in activities aimed at influencing legislation. Accordingly, the tax-exempt revocation was properly applied retroactively.

Reversed.