THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6715-86X.          Filed September 17, 1987.

*M. Bernard Aidinoff* and *Karen L. Halby*, for the petitioners.

*Vincent J. Guiliano*, for the respondent.

OPINION

STERRETT, *Chief Judge*: Petitioner, the Association of the Bar of the City of New York, seeks a declaratory judgment

pursuant to section 7428(a)[1] that it is exempt from taxation under section 501(a) as an organization described in section 501(c)(3). The sole issue for decision is whether petitioner's practice of rating judicial candidates for public office constitutes participation or intervention in political campaigns on behalf of such candidates, which is prohibited by section 501(c)(3).[2]

This case was submitted for decision on the stipulated administrative record under Rule 122. The facts and representations contained therein are assumed to be true for purposes of this proceeding and are incorporated herein by this reference. Rule 217(b)(1). Petitioner has exhausted its administrative remedies as required by section 7428(b)(2) and Rule 210(c)(4) and filed its petition for declaratory judgment (exempt organization) in this case on March 14, 1986.

Petitioner, a bar association, was incorporated by a special act of the New York Legislature, passed on April 28, 1871, (chapter 819, New York Laws of 1871, amended chapter 134, New York Laws of 1924)—

for the purposes of cultivating the science of jurisprudence, promoting reforms in the law, facilitating the administration of justice, elevating the standard of integrity, honor and courtesy in the legal profession and cherishing the spirit of brotherhood among the members thereof.

At the time it filed its petition in this case, petitioner's principal place of business was located at 42 West 44th Street, New York, New York.

Petitioner has been recognized as exempt from Federal income tax under the Internal Revenue Code of 1939 as an organization described in the predecessor of current section 501(c)(6).[3] On May 25, 1982, petitioner filed an initial

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Sec. 501(c)(3) was not amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085. However, we note that just prior to publication of this opinion, legislation was introduced in Congress to amend sec. 501(c)(3) and related sections, referred to as "The Tax-Exempt Organizations' Lobbying and Political Activities Accountability Act of 1987." The proposed legislation would, inter alia, impose new disclosure requirements, excise taxes, and additional taxes, and would authorize injunctive action with respect to prohibited lobbying and political activities by tax-exempt organizations described in sec. 501(c)(3). H.R. 2942, 100th Cong., 1st Sess. (1987).

[3]There is no express statutory prohibition against participation or intervention in political campaigns under sec. 501(c)(6). However, unlike sec. 501(c)(6), contributions to organizations

request with respondent's Office of the District Director in Manhattan for recognition as a tax-exempt charitable and educational organization, "Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code," Form 1023 (the application). In the application, petitioner stated that it did not and will not engage in activities tending to influence legislation or intervene in any way with political campaigns.

Petitioner's primary activities are educational and include sponsoring a substantial number of lectures, symposia, and panel discussions for members of the legal profession and the general public, maintaining an extensive law library, organizing and administering an annual moot court competition, and publishing numerous educational materials. In its request for recognition of tax-exempt status, petitioner stated that among its principal activities, it—

Considers the qualifications of candidates for judicial office or for any other office connected with the administration of justice. Candidates are considered in an objective and nonpartisan manner on the basis of their professional ability, experience, character and temperament and are rated as "approved", "not approved" or "approved as highly qualified".

Many of petitioner's activities are conducted through its more than 50 standing committees, each of which is assigned responsibility with respect to a particular area of the law. The standing committees include the committee on the civil court of the city of New York; the committee on criminal courts; the committee on the family court and family law; the committee on the Federal courts; the committee on State courts of superior jurisdiction; and the committee on the trusts, estates, and surrogates' courts, all of which are collectively referred to as the court committees, and the committee on the judiciary.

Through its court committees and its committee on the judiciary, petitioner engages in various activities intended to facilitate the fair and orderly administration of justice. The court committees are authorized to observe courts and make such reports and recommendations as they deem advisable, and to investigate the conduct and the qualifications of judicial officers, and candidates therefor, and other

described in sec. 501(c)(3) are deductible for Federal income, estate and gift tax purposes. See secs. 170(a)(1) and (c)(2)(D), 2055(a)(2), 2106(a)(2)(A)(ii), and 2522(a)(2).

persons connected with the administration of justice. The committee on the judiciary has the authority to rate candidates for various elective and appointive judicial offices enumerated below.

At the time of the application, petitioner's bylaws provided that—

2. The committee [on the judiciary] shall endeavor to secure the nomination, election, certification, or appointment of qualified candidates, to prevent the nomination, election, certification, or appointment of unqualified candidates, and to prevent political considerations from outweighing fitness in the selection of candidates for judicial office or for any other office connected with the administration of justice in the Court of Appeals of the State of New York, the Court of Claims of the State of New York, state and city courts in the City of New York, the United States Court of Appeals for the Second Circuit, and the United States District Courts for the Southern and Eastern Districts of New York, or for the office of District Attorney of any county within the City of New York or of United States Attorney in the Southern and Eastern Districts of New York. The committee shall consider the fitness of candidates proposed for nomination, appointment, or certification, or nominated for election to any such office, and may confer with any person or group with respect to any such candidate. The committee may prepare a list or lists of persons qualified to hold any such office and may confer with any person or group with respect thereto.

Included in the application was a proposed amendment to petitioner's bylaws to substitute the following language for the paragraph cited above:

2. The committee [on the judiciary] shall consider the fitness of candidates proposed for nomination, appointment, or certification or nominated for election to judicial office or to any other office connected with the administration of justice in the Court of Appeals of the State of New York, the Court of Claims of the State of New York, state and city courts in the City of New York, the United States Court of Appeals for the Second Circuit, and the United States District Courts for the Southern and Eastern Districts of New York, or for the office of District Attorney of any county within the City of New York or of United States Attorney in the Southern and Eastern Districts of New York. The candidates shall be rated as "Approved", "Not Approved" or "Approved as highly qualified" as may be appropriate. In rating a candidate, the committee may confer with any person or group and shall consider the candidate's professional ability, experience, character, temperament and the candidate's possession of such special qualifications as may be necessary or desirable for the performance of the duties of the office for which the candidate is being considered. The rating shall be conducted in an objective and nonpartisan manner.

The committee on the judiciary's latitude is limited to rating candidates as either "approved," "not approved," or "approved as highly qualified." More than one candidate for the same office may receive the same rating. Ratings generally depend upon a comparison of each candidate's competence, ability, and other qualities with standards set by petitioner and not upon comparisons among the candidates. A "not approved" rating often includes a short statement explaining the reason for such rating; no explanation is given for the other ratings. A candidate who receives a "not approved" rating by less than a unanimous vote also may appeal to the executive committee, which shall apprise the candidate of the nature of the information upon which the rating was based.

Candidates are rated in accordance with the following procedure:

(1) A subcommittee is formed to conduct the initial investigations;

(2) In the case of a sitting judge, the subcommittee's activities include:

(a) conducting a personal interview,

(b) reviewing any professional writings of the candidate, including recent opinions,

(c) reviewing the record of one or more recent trials over which the judge presided, and

(d) conducting such other investigations as it considers appropriate;

(3) The subcommittee submits its recommendations to the full Committee on the Judiciary, which may also interview the candidates;

(4) The rating assigned to a candidate is assigned by the full Committee on the Judiciary;

(5) Candidates rated "Not Approved" with a minimum number of dissenting votes are (a) notified of the conclusion, (b) apprised of the bases for the conclusion, and (c) advised of the right to appeal the rating to petitioner's Executive Committee.

The ratings are released to the public in the form of press releases and have been published in The Record of the Association of the Bar of the City of New York (the Record), petitioner's official publication, which is disseminated to petitioner's members and approximately 120 subscribers, most of which are libraries and law schools.[4]

More than one candidate for a given position may, and often does, receive the same rating. On occasion, all of the

---

[4]The administrative record states simply that the ratings are published in the Record, although petitioner contends that it has not published its ratings therein since 1981. We are unable to verify petitioner's contention from the record before us.

candidates for a given position have received identical ratings. For example, in November 1981, all of the judicial candidates for the 11th judicial district of the supreme court and for the 4th and 6th districts of the civil court in New York County were rated as "approved."

From 1980 through 1984, the committee on the judiciary rated a total of 272 candidates for judicial offices in the supreme court of the State of New York (supreme court) and the civil court of the city of New York (civil court), as follows:

|  | Court | Approved | Not approved | Approved as highly qualified | Total |
|---|---|---|---|---|---|
| 1980 | Supreme Court | 17 | 3 | 0 | 20 |
|  | Civil Court | 8 | 7 | 0 | 15 |
| 1981 | Supreme Court | 14 | 3 | 0 | 17 |
|  | Civil Court | 18 | 18 | 1 | 37 |
| 1982 | Supreme Court | 35 | 19 | 2 | 56 |
|  | Civil Court | 15 | 11 | 0 | 26 |
| 1983 | Supreme Court | 14 | 10 | 1 | 25 |
|  | Civil Court | 14 | 18 | 0 | 32 |
| 1984 | Supreme Court | 6 | 10 | 1 | 17 |
|  | Civil Court | 12 | 15 | 0 | 27 |
|  | Total | 153 | 114 | 5 | 272 |

Respondent issued a proposed adverse determination letter (the proposed determination), dated June 7, 1983, with respect to petitioner's application for recognition of tax-exempt status. The proposed determination concluded that petitioner's practice of rating candidates for elective judicial office is a proscribed political activity that violates the "operational test" set forth in section 1.501(c)(3)-1(c), Income Tax Regs, and therefore precludes petitioner's classification as an organization described in sec. 501(c)(3).[5]

[5]The proposed determination also stated that petitioner failed to satisfy the "operational test" in sec. 1.501(c)(3)-1(c), Income Tax Regs., because (1) petitioner's practice of reviewing existing and proposed legislation constituted proscribed legislative activities, and (2) certain other activities of petitioner were not purely educational and for the benefit of the general public but rather tended to promote the legal profession.

The proposed determination further stated that petitioner also failed to satisfy the "organizational test" in sec. 1.501(c)(3)-1(b), Income Tax Regs., because (1) petitioner's charter did not exclusively limit its purposes to sec. 501(c)(3) purposes, and (2) upon dissolution, petitioner's assets were not dedicated to sec. 501(c)(3) purposes. However, in the application, petitioner included a proposed amendment to its charter, to be submitted to its members following conditional exemption, which was intended to provide an acceptable method of distribution of petitioner's assets upon dissolution in order to comply with the requirements of sec. 1.501(c)(3)-1(b)(4), Income Tax Regs.

It also stated that contributions to petitioner were not deductible under section 170. The proposed determination expressly stated that the denial of petitioner's request for exemption under section 501(c)(3) did not adversely affect petitioner's status as a tax-exempt organization for purposes of section 501(c)(6).

On September 23, 1983, petitioner filed a timely protest of the proposed determination (the protest). Petitioner received written notification from the District Director of respondent's exempt organizations technical staff, dated December 23, 1983, that the protest did not alter respondent's original determination. This case was forwarded to respondent's Office of the Regional Director of Appeals for further consideration and, on January 19, 1984, petitioner met with respondent's appeals officer. In a letter dated April 3, 1984, petitioner requested that the issues presented in the proposed determination and the protest be submitted to respondent's National Office for technical advice.

On March 22, 1985, petitioner submitted to respondent's National Office certain additional information, requested by respondent during a conference between the parties on January 9, 1985, with respect to petitioner's practice of rating candidates for election to judicial office, as well as with respect to petitioner's legal referral service program, legislative, and social activities.

On November 5, 1985, respondent's National Office issued a Technical Advice Memorandum that concluded that petitioner did not qualify for exemption from Federal income tax under section 501(c)(3) because petitioner "is participating or intervening in political campaigns on behalf of candidates for public office, an activity that is prohibited under section 501(c)(3) of the Code."[6] On December 19, 1985, respondent issued a final adverse determination letter (the final determination) that denied petitioner's application for recognition of tax-exempt status as an organization described in section 501(c)(3) based upon the determination that petitioner's "rating activities constitute intervention or participation in political campaigns on behalf of candidates

---

[6]The Technical Advice Memorandum also stated that, with respect to petitioner's legislative activities, if petitioner otherwise qualified for exemption it would be entitled to make an election under sec. 501(h) and would fall safely within the parameters of secs. 501(c)(3) and 4911. See note 4 *supra*.

for public office which is prohibited under section 501(c)(3) of the Code." The final determination also concluded that contributions to petitioner are not deductible under section 170.

Section 501(a)[7] provides for the exemption from Federal taxation of certain organizations described in section 501(c). Section 501(c)(3) includes corporations organized and operated exclusively for one or more specified exempt purposes (see sec. 1.501(c)(3)-1(a)—(c), Income Tax Regs.), provided that such exempt organizations do not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." The narrow issue for decision is whether respondent has properly denied petitioner's application for tax-exempt status based upon the determination that petitioner's practice of rating judicial candidates constitutes prohibited political campaign activities within the meaning of section 501(c)(3).[8] The burden of proof is on

---

[7]Sec. 501 provides in relevant part as follows:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

\* \* \* \* \* \* \*

(6) Business leagues, chambers of commerce, real-estate boards, boards of trade * * * not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

[8]Alternatively, petitioner argues that its rating activities represent an insubstantial part of its overall educational and charitable activities and therefore should not result in the denial of sec. 501(c)(3) status. Respondent argues that, even though sec. 501(c)(3) permits an insubstantial amount of certain nonexempt activities, the prohibition against participation or intervention in political campaigns is absolute and is not subject to a substantiality test.

Based upon the analysis below, we need not address the parties' positions with respect to these arguments. However, we note that petitioner's rating activities are among many activities conducted by its more than 50 standing committees and, as respondent stated in his Technical Advice Memorandum, "It is quite clear that [petitioner's] primary activities are

petitioner to overcome the grounds stated in respondent's adverse final determination letter. *First Libertarian Church v. Commissioner*, 74 T.C. 396, 402 (1980); Rule 217(c)(2)(i).

The basis for respondent's adverse determination is that petitioner's rating activities violate the "operational test" set forth in the regulations promulgated under section 501(c)(3).[9] Respondent argues that petitioner is not operated exclusively for exempt purposes because it is an "action" organization, defined in the regulations as follows:

An organization is an "action" organization if it participates or intervenes, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office. The term "candidate for public office" means an individual who offers himself, or is proposed by others, as a contestant for an elective public office, whether such office be national, State or local. Activities which constitute participation or intervention in a political campaign on behalf of or in opposition to a candidate include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate. [Sec. 1.501(c)(3)-1(c)(3)(iii), Income Tax Regs.[10]]

Whether an organization satisfies the "operational test" is a question of fact to be resolved on the basis of all of the evidence presented by the record. *Church of Scientology of California v. Commissioner*, 83 T.C. 381, 474 (1984), affd. 823 F.2d 1310 (9th Cir. 1987).

The Court of Appeals for the Second Circuit, to which this case would be appealable, has held that, based upon its total operations, petitioner is a scientific, educational, and charitable organization such that for Federal estate tax purposes, certain conveyances to petitioner constitute charitable bequests. *Dulles v. Johnson*, 273 F.2d 362, 367-368 (2d

---

educational." We find that petitioner's ratings constitute an insubstantial part of its overall exempt activities.

[9]Sec. 1.501(c)(3)-1, Income Tax Regs, provides in relevant part as follows:

(c) *Operational test.* (1) *Primary activities.* An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

[10]Although respondent no longer argues that petitioner also fails to satisfy the "organizational test" set forth in the regulations, we note that the regulations provide that an organization is not organized exclusively for one or more exempt purposes if its articles of organization expressly empower it "Directly or indirectly to participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office." Sec. 1.501(c)(3)-1(b)(3)(ii), Income Tax Regs.

Cir. 1959).[11] However, that case was decided under section 812(d) of the Internal Revenue Code of 1939, the predecessor of current section 2055, which had no express prohibition against political campaign activities.[12] The parties agree that its decision is not dispositive of the issue presented here.[13] Nevertheless, petitioner maintains that the decision supports its position that its practice of rating judicial candidates is consistent with charitable and educational purposes, citing the following language therefrom:

There is no dispute but that * * * [petitioner has] probed into the qualifications of candidates for judicial office. * * * Recommendations concerning judicial candidates have been non-partisan and reflect primarily an evaluation of the professional experience and technical ability of the candidates. Here the committees perform a most valuable function, for lawyers are peculiarly well equipped to seek out and remedy flaws in the judicial machinery and to assess the performances and capabilities of judges. In today's immensely complex society they alone, perhaps, are alert to watch for and attempt correction of manifest defects prior to the time when malfunctions become apparent to everyone. These activities clearly constitute a public service, and we fail to discern that they indicate that * * * [petitioner] seek[s] to achieve a selfish professional benefit thereby. [273 F. 2d at 366-367.]

Here, respondent does not focus on any "selfish professional benefit" achieved by petitioner but rather whether the rating activities violate the specific language of section 501(c)(3), as amended subsequent to the decision in *Dulles v. Johnson*, regardless of petitioner's motive or whether such activities benefit the public.

The parties agree that certain nonpartisan "voter education" activities do not constitute prohibited political cam-

---

[11]Respondent has announced that it will not follow the decision in *Dulles v. Johnson*, 273 F.2d 362 (2d Cir. 1959). Rev. Rul. 71-505, 1971-2 C.B. 232.

[12]Sec. 101(6) of the Internal Revenue Code of 1939, the predecessor of current sec. 501(c)(3), also had no such express prohibition. The language "and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office" was added to section 501(c)(3) of the bill that was enacted as the Internal Revenue Code of 1954, Pub. L. 591, 68A Stat. 3, by a floor amendment of then-Senator Lyndon B. Johnson. 100 Cong. Rec. 9604 (July 2, 1954); No. 102a (2) to H. R. 8300, 83d Cong., 2d Sess. 205 (1954); H. Rept. 2543, 83d Cong., 2d Sess. 46 (1954).

Identical statutory language was added to secs. 170(c)(2)(D), 2055(a)(2), 2106(a)(2)(A), and 2522(a)(2) of the Internal Revenue Code of 1954 by secs. 201(a) and 201(d)(4)(A)—(C) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 549, 561.

[13]Respondent presents, as a second issue for decision, that based upon either the doctrine of collateral estoppel or res judicata, the decision in *Dulles v. Johnson, supra*, does not bar his denial of petitioner's application for tax-exempt status. Inasmuch as petitioner agrees that its classification under sec. 501(c)(3) is not mandated by that decision based upon either of such doctrines, we need not address respondent's arguments.

paign activities within the meaning of section 501(c)(3). Therefore, the issue presented may be more narrowly redefined as whether respondent has properly determined that petitioner's rating activities do not constitute permissible voter education activities.[14] In resolving this matter, we are limited to an examination of the administrative record.

The proposed amendment to petitioner's bylaws authorizes the committee on the judiciary to investigate the qualifications of judicial candidates upon consideration of their professional ability, experience, character, temperament, and other special qualifications.[15] Petitioner maintains that its ratings are designed to inform the public whether professionals practicing in the legal field believe that the candidates possess the necessary technical ability and professional qualifications for judicial office.

In *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972), a religious organization was denied section 501(c)(3) status, in part, because of its intervention in political campaigns. The court found that although the organization did not formally endorse specific candidates, it used its publications and broadcasts to urge support for certain candidates and to attack others. 470 F.2d at 856-857. Petitioner argues that under *Christian Echoes*, prohibited political campaign activities encompass attempts to influence the outcome of campaigns but not the mere publication of information about candidates. Respondent argues that, even assuming petitioner's interpretation of that decision is correct, the real purpose of petitioner's ratings is to influence the election of judges in the New York City area.

We find that petitioner's practice of rating judicial candidates does not constitute prohibited interference with political elections. The ratings do not support or oppose the candidacy of any particular individual or recommend that

[14]Both parties argue their positions in terms of several revenue rulings published by respondent, particularly Rev. Rul. 78-248, 1978-1 C.B. 154 (revoking Rev. Rul. 78-160, 1978-1 C.B. 153), and Rev. Rul. 80-282, 1980-2 C.B. 178, which amplified Rev. Rul. 78-248. Respondent concedes that the facts of the instant case are distinguishable from those in Rev. Rul. 67-71, 1967-1 C.B. 125. However, absent special circumstances, revenue rulings merely represent respondent's position with respect to a specific factual situation (*Haley Bros. Construction Corp. v. Commissioner*, 87 T.C. 498, 517 n. 21 and cases cited therein (1986)), and are not precedential in this Court. *Gordon v. Commissioner*, 88 T.C. 630, 635 (1987).

[15]Of course, the analysis herein is based upon the assumption that such proposed amendment will be adopted by petitioner's members.

the public vote for or against a specific candidate. Rather, petitioner is limited to evaluating candidates as either "approved," "not approved," or "approved as highly qualified." More than one candidate for a given office may, and often does, receive the same rating; in certain instances, each of the candidates for a given office has received the same rating.[16]

Respondent argues that, by its ratings, petitioner intervenes in political campaigns because it injects its subjective "ideal standards" of judicial candidates, which respondent contends is the very activity that section 501(c)(3) is meant to prevent. The prohibition against political campaign activities by section 501(c)(3) organizations stems from the general policy that the Federal Government should be neutral in political matters and therefore should not directly or indirectly subsidize such activities. See *Cammarano v. United States*, 358 U.S. 498, 512-513 (1959); *Slee v. Commissioner*, 42 F.2d 184, 185-186 (2d Cir. 1930), affg. 15 B.T.A. 710 (1929); *Christian Echoes National Ministry, Inc. v. United States*, supra at 854.[17]

We are aware of the potential for abuse inherent in the types of activities engaged in by petitioner, and recognize that ratings, by their very nature, necessarily will reflect the philosophy of the organization conducting such activities. Further, there obviously would be no point to making the ratings if they were kept secret, and it is equally obvious that the ratings are published with the hope that they will have an impact on the voter. Nonetheless, we do not believe that the mere practice of rating candidates for elective office without more is, per se, a prohibited political campaign activity. While not determinative, it is noteworthy that petitioner states that one of the purposes of its ratings is "to prevent political considerations from outweighing fitness in the selection of candidates."

---

[16]Also compare with *Hammerstein v. Kelley*, 235 F. Supp. 60, 64-66 (E.D. Mo. 1964), affd. 349 F.2d 928 (8th Cir. 1965), in which a bequest to a medical society did not constitute a charitable transfer, in part, because the organization urged support for or opposition to specific candidates. The organization's endorsements prevented it from being classified as a charitable organization within the meaning of sec. 2055, as in effect prior to amendment by the Tax Reform Act of 1969. See note 11 *supra*.

[17]See also *Bowman v. Commissioner*, T.C. Memo. 1976-206; cf. *Abortion Rights Mobilization, Inc. v. Regan*, 544 F. Supp. 471, 486-487 (S.D. N.Y. 1982).

Petitioner does not base its ratings on partisan or political preferences. The ratings are based on each candidate's professional experience and technical ability as compared to standards that petitioner intends to be objective. It is significant that the ratings are not based upon comparisons between candidates seeking the same office. Additionally, "not approved" ratings often include short statements explaining such conclusions, which enable voters to decide whether they agree with the negative evaluations; no such explanations accompany either the "approved" or "approved as highly qualified" ratings, as those candidates are determined to be fit for the offices they seek.

Respondent also argues that petitioner's publication of its ratings in the Record and as press releases constitutes intervention in political campaigns. He adds that petitioner's ratings of candidates prior to primary elections evidence its attempt to secure the nomination and election of particular candidates. However, it is important to note that, so far as the administrative record reveals, petitioner merely reports its ratings and does not actively seek to influence the outcome of elections, for example, by distributing statements or other campaign literature on behalf of or in opposition to any candidate. In the tax parlance of the day, petitioner's announcement of its ratings is a totally passive, not active, activity. Rather, petitioner evaluates solely whether, in its professional opinion, each of the candidates is qualified for the office he seeks.

We conclude that, based upon all of the facts and representations contained in the administrative record, petitioner's rating activities do not constitute prohibited political campaign activities within the meaning of section 501(c)(3). We find for petitioner that it is an organization described in section 501(c)(3) and is exempt from taxation under section 501(a).

> *An appropriate order and decision will be entered.*[18]

Reviewed by the Court.

---

[18]Petitioner filed a motion for oral argument in this case, dated July 10, 1986, which motion was objected to by respondent. Based on all of the foregoing, petitioner's motion is deemed unnecessary and is hereby denied.

NIMS, WHITAKER, SHIELDS, HAMBLEN, SWIFT, GERBER, PARR, WILLIAMS, and WELLS, *JJ.*, agree with the majority opinion.

---

CHABOT, *J.*, dissenting: The majority hold that an organization does not participate in political campaigns on behalf of candidates for public office when the organization rates the qualifications of candidates for elective judicial public office, and publishes those ratings with the hope that the ratings will influence the voters. I would hold that this activity constitutes participation in political campaigns on behalf of the more highly rated candidates, and thereby violates the restrictions of section 501(c)(3).

## I. *The Statute*

Petitioner asks us to declare, under section 7428,[1] that it is a section 501(c)(3) organization. The relevant portions of section 501(c)(3) are set forth *supra*, in the majority's opinion at note 7. As may be seen from the text of section 501(c)(3), an organization must clear each of many separate hurdles in order to be described in section 501(c)(3). Such an organization must show the following:

(1) It is organized exclusively for one or more of the purposes listed in the statute; *and*

(2) It is operated exclusively for one or more of these listed purposes; *and*

(3) No part of its net earnings inures to the benefit of any private shareholder or individual; *and*

---

[1]Sec. 7428(a) provides, in pertinent part, as follows:

SEC. 7428. DECLARATORY JUDGMENTS RELATING TO STATUS AND CLASSIFICATION OF ORGANIZATIONS UNDER SECTION 501(c)(3), ETC.

(a) CREATION OF REMEDY.—In a case of actual controversy involving—

(1) a determination by the Secretary—

(A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) or as an organization described in section 170(c)(2),

\* \* \* \* \* \* \*

upon the filing of an appropriate pleading, the United States Tax Court \* \* \* may make a declaration with respect to such initial qualification \* \* \*. Any such declaration shall have the force and effect of a decision of the Tax Court \* \* \* and shall be reviewable as such. \* \* \*

(4) No substantial part of its activities constitutes lobbying; *and*

(5) It "does not participate in or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office", commonly referred to as "electioneering".

As we state in *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 492 (1977), "the requirements for exemption under section 501(c)(3) are stated in the conjunctive; failure to satisfy any one of them will prevent exemption."

## II. *The Facts*

The majority have found as follows:

Petitioner states that one of its "principal activities" is the rating of "candidates for judicial office". (P. 601.)

The ratings ("approved", "not approved", or "approved as highly qualfied") are made known to petitioner's members and "are released to the general public in the form of press releases". (P. 603.)

Sometimes, all the competing candidates for a given position receive the same rating. (P. 604.) During the 5 years from 1980 through 1984, only 56 percent of the judicial candidates were rated "approved", while 42 percent were rated "not approved". Evidently, competing candidates often do not receive the same rating. See table on p. 604.

"[T]here obviously would be no point to making the ratings if they were kept secret, and it is equally obvious that the ratings are published with the hope that they will have an impact on the voter." (P. 610.)

## III. *Applying the Facts to the Law*

Although many maintain that popular election of judges is bad, for a variety of reasons (and the Federal judiciary has been appointive from its inception), New York State chooses to retain popular elections for most judges, as do many other jurisdictions in the United States.[2]

---

[2]The elective process has produced many of our Nation's shining judicial adornments. We deal with New York State in the instant case. A New Yorker, Benjamin N. Cardozo, may well

Although the details of the process may vary from jurisdiction to jurisdiction, it does not appear that there is any doubt that, in New York, each of the judicial candidates who runs in the party primaries and then on party lines in the general election is (in the words of sec. 501(c)(3)) a "candidate for public office" and is conducting a "political campaign".

The majority's findings make it clear that petitioner's ratings are attempts to influence the voters in these political campaigns to support "approved" candidates over "not approved" candidates. It is apparent, from the table in the majority's opinion (p. 604), that the "approved" rating is not routinely granted and that, in many cases, petitioner provides and publishes ratings that prefer some candidates over others.[3]

Thus, it seems to be clear that one of petitioner's "principal activities" is to participate in political campaigns on behalf of candidates for public office. For the past 33 years, the Congress has said that this is an impermissible activity for section 501(c)(3) organizations. It follows that petitioner fails one of the requirements for section 501(c)(3) status, and our declaratory judgment, in the instant case, should be for respondent.

The majority point out that petitioner is already exempt under section 501(a) as an organization described in section 501(c)(6) (p. 600) and that respondent does not propose to change his favorable ruling on that score (p. 605), but the majority imply that petitioner's real objective in this litigation may be to achieve eligible contribution donee status under sections 170 (as to which we clearly have authority under sec. 7428(a)(1)(A) to render a declaratory judgment), 2055, 2106, and 2522. (P. 600.) As the majority also point out, for the past 18 years the Congress has said that the section 501(c)(3) anti-electioneering rules apply to the charitable contribution deduction provisions as well to section 501(c)(3), itself. (Pp. 607-608.)

---

be the supreme example of how the popular elective process can work to place highly qualified people into judicial office.

[3]Presumably, petitioner's rating of five candidates during this period as "approved as highly qualified" would be understood by voters as an indication that the voters ought to vote for those five, even in preference to candidates who received "approved" ratings.

## IV. *Other Matters*

### *Nonpartisan, Nonpolitical, Objective*

The majority seem to believe that it is relevant that "Petitioner does not base its ratings on partisan or political preferences" and that petitioner intends its standards to be "objective". (P. 611.)

The Congress has made the provision we deal with depend on participation in a "political campaign", and the judicial elections here involved clearly are political campaigns. Nothing in the statute suggests that participation in a political campaign is to be ignored if it proceeds from nonpartisan or "nonpolitical" preferences. Nor does anything in the statute suggest that "objective" determinations to urge voters to vote for certain candidates are permissible, that only nonobjective determinations are forbidden. Objectivity may be relevant in determining whether the organization is operating exclusively for educational purposes (see sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs.), but neither the statute nor the regulation draws this line with regard to the anti-electioneering requirement. See, e.g., *Hancock Academy of Savannah, Inc. v. Commissioner*, *supra*, to the effect that failure to satisfy any one of the requirements of paragraph (3) of section 501(c) will prevent exemption under that paragraph.

### *Voter Education*

The majority state that the narrow issue is whether "petitioner's rating activities do not constitute permissible voter education activities." (P. 609.)

Petitioner provides voters with little information explaining "not approved" ratings and no information at all explaining "approved" and "approved as highly qualified" ratings. (P. 611.) As a result, it hardly seems that petitioner's candidate rating activity could qualify as "educational". See sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs., which provides in relevant part as follows:

An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion.

What petitioner did is far from what most would regard as voter education. Organizations that conduct voter education activities urge citizens to register to vote, they urge citizens to enroll in the party of their choice and vote in primary elections (where this is the procedure under their State's laws), they urge people to vote in general elections, and they explain why it is an obligation of citizens to do so in this Nation and a privilege that is nonexistent or not meaningful in much of the rest of the world. Voter education activities focus on giving voters and candidates access to each other on an impartial basis, i.e., access to and by all the candidates and not merely those favored by the organization's leaders or by a special rating committee.

## Passive Activity

The majority seem to believe that it is not only relevant, but "important to note that petitioner merely reports its ratings and does not actively seek to influence the outcome of elections, for example, by distributing statements or other campaign literature on behalf of or in opposition to any candidate." (P. 611.)

Firstly, the majority have found that petitioner's ratings "are released to the general public in the form of press releases". (P. 603.) The majority acknowledge that "there obviously would be no point to making the ratings if they were kept secret, and it is equally obvious that the ratings are published with the hope that they will have an impact on the voter." (P. 610.) That petitioner, because of the prestige it enjoys, can achieve its desired effect in a dignified manner does not take away from the fact that it acts in a manner intended to affect the outcome of the elections on behalf of certain candidates for public office and in opposition to other candidates for public office. It is as active as it needs to be in order to make its endorsements known to the public.

Secondly, the statutory reference to "including the publishing or distribution of statements" is merely an illustration of the kind of activity that is subject to the statutory prohibition. It is likely that the Congress inserted this parenthetical into the last clause of section 501(c)(3) out of an abundance of caution, to prevent someone from seriously

contending that publishing or distributing of materials written by others is not within the prohibition. In any event, nothing in the statute's text or its legislative history indicates that this phrase is intended to swallow up the whole rule; rather, the use of the word "including" to introduce the phrase indicates that the enumerated activities are not all-inclusive.

## Consequences

Many section 501(c)(3) organizations have an interest in certain legislation, or other governmental matters. The majority's opinion will permit churches and synagogues, for example, to endorse (approve) or oppose (not approve) candidates for public elective office on the basis of where they stand on permitting abortions or using public funds for abortions.

Organizations that focus on research to prevent, cure, or ameliorate the effects of specific diseases will not only be able to "lobby" public officials (as they now may clearly do within limits, see sec. 501(h)), but they may threaten recalcitrant officials with retribution at the polls (by brandishing their membership lists and press releases). Indeed, if the organizations perceive that funds are limited, this may turn into a battle among the organizations, with victory perhaps dependent on the length of their respective membership lists.

A university may circularize its alumni to exert unified power at the polls in support of "qualified" candidates, i.e., those who agree with the university's positions on any of a wide range of items, from unrelated business income tax, to nuclear-free zones, to boycotting goods from specific countries.

The only care that must be taken, in order to fit within the majority's opinion, is that the section 501(c)(3) organization limit its nonmembership electioneering to press releases.

That may be the law as some of us would wish it to be, but that is not the law that the Congress wrote.

## V. *Conclusion*

Petitioner "flat-out" told the public that certain candidates for public office should be voted for and other candidates should be voted against. It made an effort to get this message to the voting public by issuing press releases. It intended that the voters be persuaded by this advice as to which candidates to vote for or against.

Petitioner thereby violated one of the specific requirements of the statute whose benefits it seeks. The Congress put the anti-electioneering provision into the law in 1954. After what some might regard as a "loophole" became apparent in *Dulles v. Johnson*, 273 F.2d 362 (2d Cir. 1959), the Congress added the anti-electioneering provision to the successor of the estate tax provision interpreted in *Dulles v. Johnson* and also to the income and gift tax provisions.

Petitioner, a prestigious bar association, appears to perform a useful function for the people of New York. Apparently, but for this activity, petitioner would qualify for section 501(c)(3) status.

We should not twist the language of the statute merely because petitioner is prestigious or because this activity, when done with care and highmindedness, may justly be viewed as an example of the legal professional acting honorably to uphold and heighten the standards of the judiciary.

As members of the bar and the bench, we may applaud petitioner for its work, but we do no honor to the bar or to the bench when we ignore or twist the language of the statute because the statute fails to suitably reward petitioner's good work.

The Congress wrote the statute; we might have written this provision differently or not at all; we should apply the statute as the Congress wrote it.

Respectfully, I dissent.

PARKER, COHEN, CLAPP, JACOBS, and WRIGHT, *JJ.*, agree with this dissent.

---

JACOBS, *J.*, dissenting. Although I share the views of Judge Chabot, I wish to separately state my dissent.

To qualify for tax exemption under section 501(c)(3), an organization cannot participate or intervene in any political campaign on behalf of any candidate for public office. By rating those candidates seeking elected judicial office and by publishing such ratings, petitioner is, in my opinion, intervening in the process of electing judges. Where more than one candidate seeks an elected judicial office, petitioner's rating of one candidate higher than another is tantamount to an endorsement by petitioner of the candidate it deems more qualified. Regardless of petitioner's motives, this constitutes a prohibited intervention. The fact that petitioner may be performing a valuable service to the electorate is, in this instance, of no import. Such may be regrettable; nevertheless, it is the law.

CHABOT and CLAPP, *JJ.*, agree with this dissent.